# EXHIBIT 9

IN ARBITRATION BEFORE THE
FINANCIAL INDUSTRY REGULATORY AUTHORITY

---

In the Matter of the Arbitration Between:

SHELDON S & JUDITH M FERKEY REVOCABLE TRUST,

    Claimant,

and

TD AMERITRADE CLEARING, INC.,

    Respondent.

FINRA Arbitration No. 16-02506

---

## AMENDED STATEMENT OF CLAIMS

### Introduction

The Sheldon S. and Judith M. Ferkey Revocable Trust ("the Ferkeys") bring this action to recover hundreds of thousands of dollars they lost in a matter of months as a result of Ameritrade's recommendation and execution of a highly speculative, unsuitable, and unapproved options margin trading strategy in the Ferkeys' retirement account. Sheldon and Judy have maintained a trust account with TD Ameritrade for many years. In 2012, Ameritrade introduced the Ferkeys to Sheaff Brock Investment Advisors and recommended that the Ferkeys allow Sheaff Brock to adopt an options trading strategy in their account. Sheaff Brock, working with their agent Two Fish Management, caused the Ferkeys to open a new options trading margin account with Ameritrade. Sheaff Brock and Two Fish became the discretionary traders for the Ferkeys' new options account. For several months, the Advisors utilized a low-risk options trading strategy, resulting in modest gains for the Ferkeys. In mid-to-late 2015, however, the available equity in the Ferkeys' account was significantly reduced, which should have caused the Advisors to adopt an even lower-risk

1


EXHIBIT 9

investment strategy. Instead, the Advisors inexplicably adopted a significantly higher-risk strategy, wholly unsuitable for the Ferkeys and their investment objectives. Not surprisingly, the speculative investment strategy failed, resulting in substantial losses to the Ferkeys' account. Despite the mounting losses in the Ferkeys' account, Ameritrade stayed silent, failed to supervise or caution the Advisors, and continued to effect each transaction. Because of Ameritrade's egregious and unsuitable behavior, the Ferkeys bring the following Statement of Claims to recover their losses, together with punitive damages, statutory interest, costs, and expenses, including attorney fees.

## The Parties

Sheldon and Judith Ferkey established the Sheldon S & Judith M Ferkey Revocable Trust as a means to safeguard their retirement account. The Ferkeys are 53 and 49 years old, respectively, and reside at 2975 Swiggum Lane, Wisconsin Rapids, Wisconsin. They have four daughters, three young adults and one teenager. Sheldon and Judy Ferkey both grew up in families of very modest means in rural central Wisconsin. Sheldon's family did not have indoor plumbing or a telephone until the 1970s, and Judy and her sister were raised by a single mother in a one-bedroom apartment, relying on food stamps and government assistance to make ends meet. Through hard work and education, both Sheldon and Judy established successful careers. They married in 1994, and have subsequently owned and operated several small businesses in central Wisconsin, including convenience stores, restaurants, a shopping mall, and most recently, car washes. Sheldon also obtained the rank of Captain in the U.S. Army Reserves and commanded the headquarters of the 120th Field Artillery and later the Firing Battery based out of Marshfield, Wisconsin. He retired from the Reserves in 2002.

Respondent TD Ameritrade Clearing, Inc. ("Ameritrade") is a broker-dealer licensed with FINRA. TD Ameritrade's CRD number is 5633 and its main office is located at 200 South 108th Avenue, Omaha NE 68154.

**Factual Allegations**

The Ferkeys began to manage their Ameritrade account themselves in the late 2000's. As a result of the economic recession, they invested modestly in mostly blue chip stocks. Their intention at the time was to grow their savings conservatively and retire in 2016, after their three oldest daughters had all graduated high school.

In 2012, an Ameritrade advisor called Sheldon to inquire about his experience with Ameritrade and solicit the Ferkeys to utilize additional investment services. Several days later, the same Ameritrade advisor called back to introduce Sheaff Brock to the Ferkeys, and recommend Sheaff Brock as advisors who could help grow the Ferkeys' account through low-risk options trading.

In September 2012, Sheaff Brock solicited the Ferkeys to open an Ameritrade options account (the "Account" or the "Ameritrade Account"). Sheaff Brock serviced the Account, and the Ferkeys granted Sheaff Brock full discretionary authority for the purchase and sale of securities. At some point during the life of the Account, Two Fish also became involved as a "sub-advisor" (Sheaff Brock and Two Fish are hereinafter collectively referred to as the "Advisors"). At all times, trades in the Account were effected by Ameritrade.

The Ameritrade Account managed by Sheaff Brock and Two Fish was a margin account, meaning the Ferkeys would borrow money from Ameritrade to buy and sell options. Industry regulations require a certain ratio to be maintained in margin accounts between the account exposure and the account equity. Failure to maintain that ratio can result in margin calls, in which

3

investors are required to either add more equity to the account or liquidate their position, typically at a loss.

The purpose of the Ameritrade Account, as recommended by Ameritrade, was to realize income through the sale of put options. A put option commits the seller (also known as the writer) to purchase the underlying asset at a pre-determined price at the demand of the owner of the put, until the expiration of the option contract. For incurring this obligation, the seller of the put is paid a premium by the buyer. If the option expires without being exercised by the owner, the premium is said to have been earned by the writer.[1]

Early options activity in the Ferkeys' Account was relatively modest in risk. Although many positions were established, they were generally well "out of the money," meaning that there would have to be a substantial downward movement in the price of the underlying asset for it to be advantageous for the owner to exercise his contract. These positions were also generally written with short-term expirations (one or two months), thus limiting the time during which such downward price movement in the underlying asset might occur. This could be described as a market-neutral to modestly bullish strategy. Reflecting the lower risk of these positions, the Ferkeys were paid relatively small premiums. As the substantial majority of these positions did expire unexercised, the strategy appeared to have been working as described and as intended.

Several factors subsequently affected the Ferkeys' Ameritrade Account: 1) Substantial withdrawals from the Account by the Ferkeys, which reduced the equity available to support these margin option positions; 2) A severe downturn in the market, particularly beginning in mid-2015,

---

[1] For example, under the investment strategy proposed by the Advisors, if ABC Company was currently trading at $100/share, the Ferkeys might sell Investor X a one-month put option for 100 shares of ABC at a premium of $2/share, and with a strike price of $90/share. In this scenario, if the price of ABC Company stock falls below $90/share during that month, Investor X would have the right to sell 100 shares of ABC Company to the Ferkeys at $90/share. This would potentially cause the Ferkeys large losses if the value of the stock has fallen significantly below $90/share. If, however, Investor X never exercises the option, likely because the price of ABC Company stock never fell below $90/share, the Ferkeys would be entitled to keep the $200 premium that Investor X paid them.

which caused a further reduction in the account equity; 3)The concentration by the Advisors of the sales of puts of oil industry stocks; and 4) The sale by the Advisors of in-the-money puts, which unknown to the Ferkeys, engaged their account in a much more aggressive and risky options trading strategy.

Following these changes, the Advisors should have reduced the Account's exposure in proportion to the available equity in order to safely maintain the required margin ratio. The Advisors failed to do so. As a result, the Account came increasingly close to failure to meet minimum margin maintenance requirements. Further, as the market declined, many of the written put options positions went "in the money" (i.e., favorable for the owner to exercise), requiring the Ferkeys, as the writer, to close the position at a loss, or to purchase the underlying asset at a price above current market value.

Rather than continuing with the relatively low risk "out of the money," short-term expirations, the Advisors responded by substantially increasing the risk, writing puts that were already well into the money, and with much longer expirations. Ameritrade effected each of these sales of in-the-money puts. To be successful, this new approach would have required that the market price of the underlying assets move substantially up prior to expiration. Rather than a market-neutral to moderately bullish strategy, this became a highly bullish strategy, unsuitable for the Ferkeys. In light of subsequent market performance, the Advisors' strategy was not only unsuccessful, but resulted in substantial losses to the Account. To make matters worse, as a result of the Advisor's failure to respond appropriately to the reduced equity in the Account, the Ferkeys were subjected to several significant margin calls. Despite the mounting losses in the Ferkeys account, Ameritrade stayed silent, failed to supervise or caution the Advisors, and continued to effect each and every transaction.

### Claim 1: Violation of Wisconsin Uniform Securities Act

It is unlawful for any person or entity, in connection with providing advice for the purchase or sale of a security, to "make any untrue statement of a material fact," "omit to state a material fact" that is necessary in order to make the statements made not misleading, or to "engage in an act, practice, or course of business that operates … as a fraud or deceit upon another person." Wis. Stat. § 551.501(2) and (3). Violations of this standard are the grounds for a civil action to recover the value of the security, less any income received, plus 5% interest and attorney fees. Wis. Stat. § 551.509. Pursuant to a longstanding decision of the Wisconsin Court of Appeals, recovery under Section 551.501 does not require any assertion, evidence, or proof of *intent* to defraud. *State v. Temby*, 108 Wis. 2d 521, 322 N.W.2d 522 (Ct. App. 1982); *accord*, *State v. Mueller*, 201 Wis. 2d 121, 137-39, 549 N.W.2d 455 (Ct. App. 1996). All that is required is that a broker fail to disclose a material fact or misrepresent a material fact of an investment he or she was recommending, or engage in an act or course of business that operates as a fraud or deceit on another.

By recommending and making the investments for the Ferkeys' Account, Ameritrade and the Advisors made implicit representations that the investments were suitable for the Ferkeys. Ameritrade and the Advisors failed to disclose material facts that were necessary to make the representations that were made not misleading. Further, by making unsuitable investments for the Ferkeys without their knowledge or approval, Ameritrade and the Advisors engaged in an act, practice, and course of action that operated as a fraud and deceit upon them.

Pursuant to Wisconsin DFI-Sec 7.03, "Civil Liabilities," TD Ameritrade is liable for any violations of Wisconsin's Uniform Securities Law as the party that effected the trades in the discretionary account managed by the Advisors. The code states, "(1) For purposes of s. 551.509 (2) and (3), Stats. [Liability of Seller to Purchaser], any person who places an order or **effects a**

6

**transaction** involving the purchase or sale of a security for the account of a customer pursuant to discretionary authority **is deemed to be offering or selling or purchasing a security.**" (Emphasis added). Thus, TD Ameritrade, because it was effecting each and every trade in a discretionary account, is liable under Wis. Stat. § 551.509 for the violative conduct in the Ferkeys' account.

As a result of Ameritrade's violations of Wisconsin's Uniform Securities Law, the Ferkeys were damaged in an amount to be determined at hearing.

### Claim 2: Negligence and Negligent Misrepresentation/Unsuitability

Ameritrade owed a duty of care to its customers and account holders, including the Ferkeys. Those duties included only making suitable recommendations of securities to the Ferkeys, pursuant to FINRA Rule 2111, and specifically, suitable recommendations of options, pursuant to FINRA Rule 2360(b)(19). Ameritrade's duties required them to consider important factors such as the Ferkeys' life stage and particular circumstances when analyzing which investments would be suitable for the Ferkeys. In addition, Ameritrade was required to conduct extra diligence before approving the Ferkeys' Account for options trading, pursuant to FINRA Rule 2360(b)(16).

Ameritrade opened an options account and cause unsuitable investments to be made for the Ferkeys, including speculative put options that were already well into the money with long expirations. Ameritrade and the Advisors recommended and made these unsuitable investments on behalf of the Ferkeys without their knowledge or approval. Ameritrade breached its duty of care to the Ferkeys in recommending and making these unsuitable investments for them. Absent Ameritrade's acts and omissions, the Ferkeys would not have made these unsuitable investments. As a result, the Ferkeys were damaged in an amount to be determined at hearing.

### Claim 3: Failure to Supervise

Respondent TD Ameritrade was required under FINRA Rule 3120 to "establish, maintain, and enforce a system of supervisory control policies and procedures … to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules." FINRA rule 2360(b)(18)(A)(ii) imposes a further duty on TD Ameritrade for effecting options trades in discretionary accounts, requiring that "Discretionary accounts shall receive frequent appropriate supervisory review by a Registered Options Principal who is not exercising the discretionary authority." Finally, FINRA Rule 2360(b)(20) requires that each FINRA member "that conducts a public customer options business shall ensure that its written supervisory system policies and procedures pursuant to Rules 3110, 3120, and 3130 adequately address the member's public customer options business." TD Ameritrade either failed completely to supervise the Ferkeys' Account as required by FINRA rules, or worse, turned a blind eye to the unsuitable trading that caused significant destruction to the value of the Ferkeys' Account in a matter of months.

As discussed above, TD Ameritrade breached their duty to supervise by, among other things: (1) failing to develop adequate procedures to ensure the suitability of sales of investments to the Ferkeys; (2) failing to ensure and have systems in place to ensure that an options trading strategy for the Ferkeys was suitable; (3) negligently supervising the sale of unsuitable investments, including the writing of put options with long expirations that were already well into the money, to the Ferkeys; and (4) failing to thoroughly investigate evidence in their possession that unsuitable transactions had been made for the Ferkeys.

TD Ameritrade's acts and omissions injured the Ferkeys. Indeed, but for TD Ameritrade's acts and omissions, the Ferkeys would not have made these unsuitable investments. Accordingly, TD Ameritrade is liable for damages in an amount to be proved at hearing.

## Punitive Damages

Given the egregious nature of the conduct of Ameritrade described above and to be presented at hearing, including but not limited to recommending that the Ferkeys engage in options trading with Sheaff Brock, effecting unsuitable investments made for the Ferkeys, allowing the Ferkeys to make unsuitable investments, failing to notify the Ferkeys of the fact that these unsuitable investments had been made for them, and failing to take steps to remedy the situation that the Ferkeys were put in as a result of being sold these unsuitable investments, the Ferkeys seek punitive damages from Ameritrade.

FINRA rules permit the panel to consider punitive damages stating, "[u]pon a party's request, arbitrators may consider punitive damages as a remedy if a respondent has engaged in serious misconduct that meets the standards for such an award." FINRA Arbitrator Guide, pg. 65, 2015. FINRA goes on to explain that, "[t]he standards for awarding punitive damages vary from state to state." *Id.* In Wisconsin, the standard for punitive damages is set forth by statute. "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted … in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043.

Ameritrade's actions as outlined in this Statement of Claims and as will be presented at hearing constituted an intentional disregard of the rights of the Ferkeys and therefore the panel should award punitive damages.

## Relief Requested

The Ferkeys requests the following relief from the panel:

a. That Respondent pay the Ferkeys for their losses, which exceed $500,000, suffered as a result of its negligence and failure to supervise, in an amount to be determined at hearing;

b. That Respondent pay the Ferkeys 5% interest from the date of injury to present, plus reasonable attorneys' fees;

c. That Respondent pay the Ferkeys recessionary damages, including actual attorneys' fees, as a result of Respondent's violations of Wisconsin's uniform securities law;

d. That Respondent pay the Ferkeys punitive damages as a result of Respondent's egregious conduct.

**A three-person panel and a hearing in Milwaukee, Wisconsin are requested.**

Dated: December 12, 2016

          HALLING & CAYO, S.C.
          Attorneys for Claimant,
              Sheldon S & Judith M Ferkey Revocable Trust

          /s/ Michael H. Schaalman
          MICHAEL H. SCHAALMAN
          State Bar No. 1015424
          mhs@hallingcayo.com

          PATRICK T. O'NEILL
          State Bar. No. 1079079
          pto@hallingcayo.com

          320 E. Buffalo Street, Suite 700
          Milwaukee, WI 53202
          (414) 271-3400