# EXHIBIT 12

BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
OFFICE OF DISPUTE RESOLUTION

In the matter of the arbitration between:

SHELDON S AND JUDITH M FERKEY          *
REVOCABLE TRUST,
                                       *
            Claimant
                                       *        Arb. No. 16-02506
and                                    *

SHEAFF BROCK INVESTMENT ADVISORS, LLC, *
TWO FISH MANAGEMENT, LLC, and          *
TD AMERITRADE CLEARING, INC.,          *

            Respondents.               *

                                       *
*      *      *      *      *      *      *      *
TD AMERITRADE CLEARING, INC.,          *

            Cross- and Counter-Claimant, *

                                       *
and                                    *

SHELDON S. FERKEY, JUDITH M. FERKEY,   *
THE SHELDON S. AND JUDITH M. FERKEY    *
REVOCABLE TRUST,                       *
SHEAFF BROCK INVESTMENT ADVISORS, LLC, *
AND TWO FISH MANAGEMENT, LLC           *

                                       *
            Counter-claim and cross-claim *
            Respondents.               *

*      *      *      *      *      *      *      *      *      *      *      *      *

            ANSWER OF RESPONDENT TD AMERITRADE CLEARING, INC.,
               TO AMENDED STATEMENT OF CLAIM, AND
        COUNTER-CLAIM/CROSS-CLAIM OF TD AMERITRADE CLEARING, INC.,
              AGAINST SHELDON FERKEY, JUDITH FERKEY,
          THE SHELDON S. AND JUDITH M. FERKEY REVOCABLE TRUST,
          SHEAFF BROCK ADVISORS, LLC, AND TWO FISH MANAGEMENT, LLC

        Respondent TD Ameritrade Clearing, Inc. ("TD Ameritrade") denies the allegations

and claims set forth in the Statement of Claim and Amended Statement of Claim, because

1


EXHIBIT
12

the facts are not as alleged -- indeed, even basic factual allegations, such as the identity of the account holders, are wrong -- the pertinent contracts and the law make clear that Claimants have no claim against TD Ameritrade, and Claimants have no damages given that the account at issue was *profitable* on a "Net Out of Pocket" basis by over $308,000.[1]

Rather, as set forth in Respondent's Counter-claim/ Cross-claim, below, Mr. and Mrs. Ferkey, the Sheldon S. and Judith M. Ferkey Revocable Trust (the "Trust"), and their agents, independent registered investment advisors Sheaff Brock Investment Advisors, LLC ("Sheaff Brock") and Two Fish Management, LLC ("Two Fish"), are liable to TD Ameritrade Clearing, Inc., for indemnification.

## Introduction

TD Ameritrade is an independent broker-dealer that offers securities brokerage and custody services to investors who wish to direct their own investments, as well as to clients of independent registered investment advisors whom the customers wish to have manage their accounts. TD Ameritrade holds the assets, routes customers' orders to market centers for execution, administers the clearance and settlement of customers' transactions, and provides recordkeeping and administrative services such as issuing monthly account statements.

---

[1] As Mr. and Mrs. Ferkey, in their individual capacities, were the owners of the account at issue for a significant portion of the time that it was managed by Sheaff Brock, for purposes of this Answer, we refer to Mr. and Mrs. Ferkey *and* their Trust as "Claimants." Over the life of the account, Claimants deposited a total of $1,398,153, and withdrew a total of $1,706,463, including the $54,957 in withdrawals they directed to pay advisory fees to Sheaff Brock.

In 2008, Sheldon and Judith Ferkey opened a joint account and two IRA accounts at TD Ameritrade.[2]   Mr. and Mrs. Ferkey initially managed their accounts themselves.   In mid-2011, after experiencing losses on some of their self-directed investments, Mr. Ferkey discussed with a TD Ameritrade branch representative the possibility of hiring an investment advisor to assist in managing their investments.   The branch representative introduced Mr. and Mrs. Ferkey to an investment advisory firm that specialized in providing conservative retirement planning, with an emphasis on dividend-bearing stocks. It proposed to liquidate some or all of their current holdings and to craft a new portfolio for them. Mr. and Mrs. Ferkey initially decided to engage that firm as their advisor; after discussions with their accountant and further consideration over a period of several months, however, they concluded that they did not want to incur the tax consequences that would flow from selling their existing stock positions.   They told the branch representative that they wanted to find an advisor to manage their accounts, but did not want to sell their stock holdings. About seven months later, after further conversations, the branch representative introduced them to Sheaff Brock, which offered, among other advisory services, an income strategy that did not require the sale of existing holdings.   TD Ameritrade did not recommend that Mr. and Mrs. Ferkey adopt any particular strategy; it merely made the introduction to Sheaff Brock for Mr. and Mrs. Ferkey's consideration, in response to their stated wishes.

Sheaff Brock sent Mr. and Mrs. Ferkey written materials describing its "put options income" strategy.   These materials also disclosed that the accounts would be "sub-advised"

---

[2] The allegation that Mr. and Mrs. Ferkey "have maintained a trust account with TD Ameritrade for many years" is inaccurate. Mr. and Mrs. Ferkey formed their Revocable Trust in September 2013. They transferred ownership of their joint account to their Trust in March 2014.

by a separate advisory firm, Two Fish. Mr. Ferkey reviewed the materials, and interviewed the Sheaff Brock representative at length over multiple telephone calls. Mr. Ferkey asked numerous questions of the Sheaff Brock representative, and obtained detailed information about the strategy and its operation, risks, costs and potential benefits. After considering Sheaff Brock's materials and information for approximately a month, Mr. and Mrs. Ferkey decided to engage Sheaff Brock to implement its "Put Income" strategy in their joint account.

In short, Claimants' allegations about how Mr. and Mrs. Ferkey came to engage Sheaff Brock -- including their suggestion that TD Ameritrade rushed them to do so -- are incorrect.

Mr. and Mrs. Ferkey specifically acknowledged in writing that they understood and agreed that, although TD Ameritrade had introduced them to Sheaff Brock, once they hired Sheaff Brock, *they* would be responsible for monitoring their advisor's performance. They agreed that TD Ameritrade would *not* be responsible for selecting their investments, for the performance of their investments, or for monitoring the performance of their investments. They acknowledged that TD Ameritrade would have *no* discretionary authority or control over their account, and that TD Ameritrade would effect only the securities transactions they or their advisor ordered. They elected to proceed with hiring Sheaff Brock.

To facilitate Sheaff Brock's advisory management of their account, Mr. and Mrs. Ferkey opened a new joint account with TD Ameritrade through its "Institutional" division. Mr. and Mrs. Ferkey applied for margin privileges, so that Sheaff Brock could use margin in their account. They also applied for approval to permit Sheaff Brock to trade options in their account. In that application, they specifically certified to TD Ameritrade in writing

that they understood and accepted the significant degree of risk inherent in options trading.

Mr. and Mrs. Ferkey gave written instructions and authorization to TD Ameritrade, directing it to process all transaction orders entered by Sheaff Brock or their sub-advisor, Two Fish, in their accounts. They agreed, again, that TD Ameritrade would have <u>no responsibility whatsoever</u> for the management of their assets, for the suitability of transactions recommended or made by their advisor, for supervising their advisor, for monitoring the transactions or investments in their accounts, or for the performance of the transactions they or their advisor ordered for their accounts. Claimants agreed that TD Ameritrade would <u>not</u> be responsible for assessing whether transaction orders were consistent with Claimants' stated objectives or risk tolerance; they expressly agreed that this assessment would be made by them and their advisor. Claimants agreed to release, indemnify and hold TD Ameritrade harmless for any losses they might sustain as a result of TD Ameritrade's following *their instructions* to take directions *from their Advisor*.

Thus, contrary to Claimants' allegations, they understood and agreed that TD Ameritrade would not be involved in any way in developing or implementing any investment strategy for their account, or for supervising Sheaff Brock's handling of their account. Further, contrary to their allegations, Claimants knew and agreed that TD Ameritrade would have no role in or responsibility for communicating with them about the risks or potential benefits of the investments or strategies their advisor pursued, either as an initial matter or as the advisor's investment strategy may have evolved over time.

TD Ameritrade fully performed its agreement with the Claimants: As agreed, TD Ameritrade followed Claimants' instructions and processed orders placed by Claimants'

5

advisors, and as agreed, TD Ameritrade provided transaction confirmations and monthly statements of their accounts. These confirms and statements clearly reflected all of the transactions that Claimants or their advisors placed in their accounts.

Claimants admit that the Sheaff Brock/ Two Fish options trading strategy was suitable and profitable for them for several years. In fact, as indicated above, by the time they transferred assets out of the account, they had achieved a cumulative profit of over $308,000 on a "Net Out of Pocket" basis.

Claimants nonetheless contend that at some point, the strategy became unsuitable for them. They seek to hold TD Ameritrade liable for following *their* express, written instructions to take directions from *their advisor*, notwithstanding their further, express, written agreements to *release* TD Ameritrade from any such claim, and to *hold TD Ameritrade harmless* from any losses, claims or damages that *it* might sustain as a result of its compliance with its Agreement, and their instructions.

It would be unfortunate if Claimants experienced losses on their investments, but even if they had, there would be no basis whatsoever upon which TD Ameritrade could be liable to Claimants for the market performance of the investments they or their advisors ordered for their account. Any dissatisfaction with their advisors' performance in managing their account is a matter between Claimants and their advisors. There is no basis for Claimants to have involved TD Ameritrade in that dispute, and their claims against TD Ameritrade should be denied in their entirety. Moreover, for the reasons set forth below, Claimants should be ordered, jointly and severally with their advisors, to pay all of the costs, including attorney's fees, that TD Ameritrade incurs in connection with this matter.

I.      Facts

        A.      A Brief Overview Of TD Ameritrade's "Institutional" Business.

        TD Ameritrade, through its "Institutional" division, provides independent registered investment advisors with administrative and custodial services that the advisors need in order to manage their clients' accounts. These services include routing of trade orders, and clearing and settling the securities transactions ordered by the client or the client's advisor for the client's account, preparing and sending periodic statements of account and transaction confirmations, and maintaining custody of the funds and securities held in client accounts.

        TD Ameritrade does not solicit orders to trade securities or make discretionary investments on behalf of customers. It may introduce clients to advisors, but it does not provide securities recommendations or advice to advisors or their clients. Similarly, TD Ameritrade does not offer proprietary investment strategies. Rather, TD Ameritrade accepts securities orders as placed by account holders or their advisors, and delivers those orders to an appropriate market for execution. Customers and advisors access the accounts primarily through the Internet, and trades are routed for execution to independent exchanges or market centers.

        B.      The Advisors' Agreements With TD Ameritrade.

        In October 2001, Sheaff Brock Investment Advisors, LLC, an independent, SEC-Registered Investment Advisor, engaged TD Ameritrade[3] to provide brokerage and custody services for Sheaff Brock's clients. To do so, Sheaff Brock submitted an Advisor Master

---

[3] The initial agreement was with TD Waterhouse, a predecessor of TD Ameritrade. We will refer to the firm as "TD Ameritrade," as TD Ameritrade is now party to the agreements with Sheaff Brock.

Account And Sub-Account Application, which included an Institutional Services Agreement. That agreement provided, among other things, that:

-- TD Ameritrade would provide discount brokerage services to Sheaff Brock and its clients;

-- TD Ameritrade would **not** make investment recommendations or decisions, or offer investment advice, and TD Ameritrade would **not** be responsible for reviewing, supervising or monitoring investment decisions or other activity in client accounts;

-- Sheaff Brock would **not** represent or imply in any way (1) that it or any of its representatives is affiliated or related in any way to TD Ameritrade; (2) that TD Ameritrade endorses or recommends Sheaff Brock; (3) that TD Ameritrade provides investment oversight; or (4) that TD Ameritrade monitors, approves or reviews Sheaff Brock, its representatives, its investment decisions, its investment recommendations, its suitability determinations and/or its trading activity. A copy of the Advisor Master Account Application, including the Institutional Services Agreement, is attached as Exhibit A.

In April 2002, TD Ameritrade and Sheaff Brock entered into an AdvisorDirect Agreement, setting forth the terms upon which Sheaff Brock would participate in TD Ameritrade's program of referring certain of its customers to independent registered investment advisors. That agreement provided, among other things, that:

• It would be **Sheaff Brock's responsibility** "to determine whether discretionary investment advice is suitable" for a referred customer and, "if so, to determine the Investor's investment objectives and needs;"

• **Sheaff Brock would be responsible** for managing the customer's assets "in a manner consistent with Client's investment objectives and needs" -- in short, for ensuring

the suitability of the strategies and transactions it adopted or placed for the client;

• TD Ameritrade would **not** "determine whether personal investment management by Advisor is suitable for the investors," and TD Ameritrade "is **not** obligated to monitor future trading activity in Advisor's Clients' accounts to ensure that Advisor's services are or remain suitable for Advisor's Clients. Such determinations and monitoring are and shall remain the sole responsibility of Advisor and its Clients."

Sheaff Brock reiterated that "Advisor will not represent or imply in any way to Clients, Investors, or others that Advisor or any of its principals, officers or employees is an officer, employee, agent or representative" of TD Ameritrade, and that "Advisor will not represent or imply in any way" that TD Ameritrade and Advisor are affiliated" or that TD Ameritrade "endorses, recommends or sponsors Advisor, that TD Ameritrade provides investment advice hereunder, or that TD Ameritrade participates in or reviews Advisor's investment or trading decisions or recommendations." A copy of the AdvisorDirect Agreement is attached as Exhibit B.

Two Fish is also an independent, SEC-Registered Investment Advisor. In September 2011, Two Fish entered into an Advisor Services Agreement with TD Ameritrade. It contained provisions materially similar to those set forth in the Advisor Services Agreement with Sheaff Brock, attached as Exhibit A, including Two Fish's acknowledgements that neither it nor its representatives is affiliated with TD Ameritrade in any way, that TD Ameritrade would not make investment recommendations or provide investment advice, and that the advisor (not TD Ameritrade) would be responsible for ensuring that all transactions it placed in customer accounts were authorized and appropriate. (Two Fish did not participate in the "AdvisorDirect" program.)

These Agreements constituted and defined the relationship between these advisory firms and their representatives, on the one hand, and TD Ameritrade, on the other. Sheaff Brock and Two Fish (the "Advisors") were *clients* of TD Ameritrade. They had no other relationship or affiliation with TD Ameritrade.

C.  Claimants' Accounts And Agreements With TD Ameritrade.

On September 20, 2012, Mr. and Mrs. Ferkey acknowledged and agreed that once they hired Sheaff Brock as their advisor, it would be *their* responsibility to monitor the advisor's performance. (A copy of this disclosure form is attached as Exhibit C.) By signing it, they further agreed, among other things, that

> TD Ameritrade is not responsible for selecting your investments, for the performance of your investments or for monitoring the performance of your investments. TD Ameritrade has no discretionary authority or control with respect to your assets under management with the Advisor and will only effect securities transactions for your account that have been instructed by you or the advisor.

They signed and submitted an account application, agreeing to be bound by the terms of the Client Agreement with TD Ameritrade. A copy of their application is attached as Exhibit D. The Client Agreement (Exhibit E) provides, in relevant part:

> **a. Self- Directed Account.** I understand that Accounts opened with you are self-directed. I am responsible for all purchase and sell orders, decisions to continue with an investment strategy or to hold an investment, and instructions placed in my Account. Unless you provide advice to me that is clearly identified by you as an individualized recommendation for me, any investment decision that I make or investment strategy that I utilize, including the decision to hold any and all of the securities or derivatives in the Account, is based on my own investment decisions or those of my agent and is at my own risk. All investments involve risk and, unless you provide individualized recommendations to me, I or my agent are responsible for determining the suitability of any trade, investment, investment strategy, and risk associated with my investments.

> \*   \*   \*

> **c. Statement and Confirmations.** It is my obligation to review trade confirmations and Account statements promptly upon receipt. These

documents will be considered binding on me unless I notify you within five days from the date confirmations are sent and within 10 days after Account statements are sent.

\* \* \*

**d. Instructions.** You may accept and act on instructions from me, my agent, or any person authorized on my Account... You do not determine the validity or my agent's status or capacity, the appropriateness of or the authority or actions by such person.

(Ex. E, Client Agreement (underlining added).)

They chose to request the ability to use margin and to trade options, and accordingly, they also executed a Margin Agreement/ Loan Consent and a Client Options Account Agreement. Copies of these agreements are attached as Exhibit F and G, respectively.

Claimants received -- and acknowledged receiving -- the Options Clearing Corporation's disclosure document, "Characteristics And Risks Of Standardized Options." The disclosure document is also available online, on the TD Ameritrade website as well as on the Options Clearing Corporation website. TD Ameritrade further apprised Claimants of the additional risks created by trading in options; the Client Options Account Agreement itself clearly explains that options trading "involves a significant degree of risk not suitable for all investors." *See* Ex. G, Options Account Agreement, p. 1 at section 5 ("Options Trading Risk Disclosure".) That section states:

> <u>**Options Trading -- Both the purchase and writing (selling) of options contracts -- involves a significant degree of risk not suitable for all investors**</u>. Investors should carefully consider the inherent risks and financial obligations of options trading as further detailed in the Options Clearing Corporation booklet, "Characteristics And Risks Of Standardized Options."
>
> <u>**I have received, read and understand the "Characteristics And Risks Of Standardized Options" booklet, or other appropriate risk disclosure document**</u>, including the current options disclosure documents prepared by the Options Clearing Corporation. Most importantly, <u>**I represent that I have paid**</u>

**particular attention to those sections of the document that pertain to the risks of options trading and investor suitability.** I understand that any information contained in the "Characteristics And Risks Of Standardized Options" booklet, including information regarding the federal income tax consequences of options transactions, is subject to change.

(Emphasis added.)

In their Options Agreement, Claimants attested that <u>they determined, through discussions with Sheaff Brock, the level of options trading that was suitable for them.</u> Claimants granted Sheaff Brock authority to engage in options trading on their behalf in their accounts, and agreed that <u>TD Ameritrade would not be responsible for the suitability of those transactions or for any losses or damages that might result.</u> (*See* Ex. I at sections 3, 4 and 15.)

Claimants also executed two Limited Power of Attorney forms, authorizing Sheaff Brock and Two Fish (and their registered investment advisor representatives) to make transactions on Claimants' behalf. It provided, in pertinent part:

> **I hereby authorize [Sheaff Brock Investment Advisors] [Two Fish Management] to be my agent and attorney-in-fact ("Agent") to buy, sell (including short sales) and trade in stocks, bonds and any other securities and/or contracts relating to the same on margin (if I have signed a margin agreement) or otherwise** in accordance with your terms and conditions in the undersigned's account and risk and in the undersigned's name, or number on your books. ... If I have signed an options agreement, **my Agent is specifically authorized to effect options transactions in my account,** within the approval limits for my account, as such terms are defined in the booklet, "Characteristics and Risks of Standardized Options," a copy of which I have received. **I hereby agree to indemnify and hold harmless TD Ameritrade, Inc. ("TD Ameritrade"), its affiliates and their directors, officers, employees and agents from and against all claims, actions, costs, and liabilities, including attorney's fees, arising out of or related to reliance on this authorization** and to pay promptly on demand all losses arising therefrom or debit balance thereon.
>
> **In all such purchases, sales or trades, you are authorized to follow the instructions of my Agent in every respect concerning my account with you; and my Agent is authorized to act for me and on my behalf in the**

**same manner and with the same force and effect as I might or could do with respect to such purchases, sales or trades,** as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades, including without limitation the delivery of securities or monies from the account in the Account Owner's or Owner's name and the provision of securities cost basis method selection and/or information for purposes of cost basis or tax reporting.

**I hereby ratify and confirm any and all transactions with you heretofore or hereafter made by my Agent for my account.** This authorization and indemnity is in addition to, and in no way limits or restricts, any rights which you may have under any other agreement or agreements between me and TD Ameritrade. ...

(Copies are attached as Exhibit H; emphasis added.)

TD Ameritrade opened the account as requested by the Claimants, and followed their authorization to accept account instructions from their selected advisors: Sheaff Brock (and its sub-advisor, Two Fish). In accordance with its contractual obligations, TD Ameritrade complied with instructions it received from the Advisors, and processed the transactions as directed in Claimants' account.

On March 19, 2014, Mr. and Mrs. Ferkey submitted written instructions to change the title of their joint account to reflect "The Sheldon S. and Judith M. Ferkey Revocable Trust dated September 5, 2013," as the owner of the account. They also submitted a Trustee Certification Of Investment Powers form, in which they agreed, once again, to be bound by the terms of the Client Agreement, as it may be amended from time to time. They further agreed:

> The undersigned Trustees jointly and severally indemnify you and hold you harmless from any liability (including attorneys' fees) **arising out of or related to any actual or alleged improper or unsuitable actions** resulting from instructions given by any of us to you. This indemnification is made by us both in our capacities as Trustees and in our individual capacities.

Trustee Certification Of Investment Powers, at paragraph 8 (emphasis added); a copy of

that form and the letter of instruction is attached as Exhibit I.

TD Ameritrade did not recommend any transaction, strategy or investment to Claimants or to their advisors at any time. TD Ameritrade had no role in developing or modifying the investment strategy that Claimants allege their advisors utilized for their accounts. TD Ameritrade had no discretion to "manage" Claimants' accounts. Accordingly, contrary to the allegations in the Statement of Claim, TD Ameritrade had no responsibility to evaluate, second-guess, reject, monitor or supervise their orders, investments or strategies. TD Ameritrade's mandate was to process trade orders as ordered by the Claimants and/or their advisor, accurately and timely, and it did so.

Every time a transaction was executed for their account, TD Ameritrade sent them a transaction confirmation showing the details of the transaction. At the conclusion of every month, TD Ameritrade sent Claimants an account statement. The statements showed all of the customer's account holdings, transactions and balances.

As set forth in the Agreement Claimants signed with TD Ameritrade, Claimants were solely responsible for reviewing these statements and transaction confirmations promptly, to ensure that their account was being handled in accordance with their expectations, agreements and understandings with their advisors.

D.   There Is No Basis For Any Claim Against TD Ameritrade.

Each of Claimants' claims is predicated on a fundamental misstatement of the law, as they wrongly contend that TD Ameritrade was responsible for the suitability of the transaction orders that Claimants' authorized agents placed for their accounts. The law is clear that "suitability" rules apply only when *the broker-dealer* is recommending a transaction. *See* FINRA Rule 2111 (the general "Suitability" rule) ("A member or an

associated person must have a reasonable basis to believe that a **recommended** transaction or investment strategy involving a security or securities is suitable for the customer...") and FINRA Rule 2360(b)(19) (the rule governing Suitability of recommendations of options transactions, which provides that the broker-dealer may not **recommend** an options transaction unless the firm has reasonable grounds to believe that it is suitable for the customer).

Here, as noted above, TD Ameritrade did not recommend *any* transaction or strategy whatsoever to Claimants, and accordingly, TD Ameritrade had no obligation to assess the suitability of the investment strategy or transactions that Claimants' advisors selected for their account.

Where the broker-dealer is not the person recommending the transaction, there is no rule, regulation or other legal requirement that a broker-dealer review, monitor or assess customers' or their advisors' orders for "suitability" prior to processing them. To the contrary, the FINRA rules and the law of agency are clear that brokers should promptly act on customers' orders and instructions, not stop and evaluate the "suitability" of customer orders. *See Lamm v. State Street Bank.*, 749 F. 3d 938, 943-44 (11th Cir. 2014)(the broker-dealer's duty is to execute the orders it receives from the account holder's designated agent); *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 111 (N.D. Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972) (a broker's duty is to buy and sell securities pursuant to the customer's order; stating, "the affair entrusted to a broker who is to buy or sell through an exchange is to execute the order, not to discuss its wisdom.").

Consistent with the law, Claimants specifically agreed that their account was *self-directed,* and that *they* would be responsible for the orders and transactions they or their

advisors selected for their accounts, for determining the suitability of any trade or investment made, investment strategy used or risk taken in their accounts, and for reviewing the transaction confirmations and statements that TD Ameritrade sent them. (Ex. E, at paras. 4.a. and 4.c.)

There is <u>no</u> provision in <u>any</u> of the Claimants' agreements with TD Ameritrade by which TD Ameritrade agreed to review, monitor or assess the "suitability" or wisdom of Claimants' specific orders, whether placed by them or by one of their advisors. To the contrary, Claimants agreed that TD Ameritrade would have <u>no</u> such obligation, and instead, was authorized to follow Sheaff Brock's and Two Fish's instructions in every respect, without any duty of inquiry. (Ex. H, para. 2.)

TD Ameritrade processed the advisors' orders, as directed by the Claimants, promptly and accurately, and thus complied fully with TD Ameritrade's responsibilities under the rules and law, and under its agreements with Claimants.

1. <u>Claimants cannot state a claim for negligence against TD Ameritrade.</u>

To establish a claim for negligence under Wisconsin law,, Claimants must prove: (1) a duty of care on the part of the defendant; (2) a breach of the duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury. *Coffey v. Milwaukee*, 247 N.W.2d 132, 135 (Wisc. 1976).

To allege a "duty," in their Statement of Claim, Claimants invoke two FINRA rules. But the law is clear that the FINRA rules, to the extent they apply at all, do not create private duties, they create *regulatory* obligations, enforceable not by private actions but by *the regulators. See Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 129 (S.D.N.Y. 2002) *aff'd sub nom. Rozsa v. SG Cowen Sec. Corp.*, 165 F. App'x 892 (2d Cir. 2006) ("Rozsa also

refers to NYSE rules relating to "Carrying Agreements" and rules relating to the diligence as to accounts and their designation. The assumed breach of these rules does not in itself provide a private right of action."); *Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106 (E.D.N.Y. 2013) ("Plaintiff's fourth cause of action, alleging violations of certain rules of the NYSE and NASD, fails to state a claim for relief because such rules 'do not confer a private right of action.'"); *BNP Paribas Mortgage Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 266-67 (S.D.N.Y. 2012) ("Courts in this district have also rejected similar efforts to derive causes of action from securities regulations premised on a negligence standard. Each court that has considered the question has concluded that mere negligent violations of the NYSE [New York Stock Exchange] or NASD [National Association of Securities Dealers] rules are not actionable...".)

Even if there were a claim available, however, Claimants will be unable to establish that TD Ameritrade owed the duties they allege, or that it breached any duties it did have.

"The courts have consistently held that where a brokerage client has a self-directed account, the broker ordinarily has no legal responsibilities beyond the prompt and accurate carrying out of any transaction directed by the client." *Stewart v. J.P. Morgan Chase*, 2004 WL 1823902 (S.D.N.Y. 2004). *See also DeKwiatkowski v. Bear Stearns*, 306 F.3d 1293 (2d Cir. 2002) ("A broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis. ... A nondiscretionary customer by definition keeps control over the account and has full responsibility for trading decisions."); *Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir. 1998) (Where the **broker** does not have discretionary control over the account, "any fiduciary relationship between [the customer] and the Defendants was limited to making investments approved by [the

customer]" (emphasis added)); *Arst v. Stifel, Nicolaus & Co.,* 86 F.3d 973, 978 (10th Cir.1996) (Same); *Commodity Futures Trading Comm'n v. Heritage Capital Advisory Servs., Ltd.,* 823 F.2d 171, 173 (7th Cir.1987) (Same).

A "self-directed" account means any account for which the *broker-dealer or the broker-dealer's representative* does not have discretionary authority to engage in transactions in the customer's account. *See Tapia, supra.* Consistent with this law, Claimants specifically agreed that their account was "self-directed." (Ex. E, at para. 4.a.)

As the Limited Power Of Attorney specifies, the Claimants appointed Sheaff Brock/ Two Fish to act as the **Claimants'** agent:

> I hereby constitute and appoint the Advisory Firm or individual named herein as **my agent and attorney-in-fact ("Agent")** to buy, sell (including short sales) and trade in stocks, bonds and any other securities and/or contracts relating to the same on margin (if I have signed a margin agreement) or otherwise in accordance with the Client Agreement (incorporated by reference) applicable to this account held in my name, or number on your books.

Ex. H, section 8.

Claimants did not have a discretionary account with TD Ameritrade. Rather, they had a self-directed account, in which their trading was conducted by their authorized agents, Sheaff Brock and Two Fish. Accordingly, the law is clear that TD Ameritrade had no fiduciary duty to Claimants, and no duties to monitor their accounts, to advise them, or to warn them of the risks of the self-directed trades made by their authorized agent. *Cf. Freeman v. Dean Witter Reynolds, Inc.,* 865 So.2d 543 (Fla. 2d DCA 2003) ("We have found no case holding that a bank breached a fiduciary duty owed to its client by failing to investigate or disclose the manner in which the client or its authorized agents used their money"). *See also, Lamm, supra* at *3 (The only duty of a broker-dealer handling an account as to which the firm or its registered representatives have no discretionary authority is to

execute the orders it receives from the account holder or the account holder's designated agent) and at *6 (Holding that there is "no source of authority imposing on [a custodian] a duty to 'be an extra pair of eyes watching the investment advisor.'").

In other words, to attempt to create claims against TD Ameritrade, Claimants seek to impose duties on TD Ameritrade that it does not have, either by contract or by law -- and that they expressly agreed that it would *not* have. But TD Ameritrade cannot have breached duties that it did not have, and in any event, TD Ameritrade did not cause the damages Claimants claim to have experienced. Claimants will be unable to establish that they suffered any damages as a proximate result of a breach of any duty on TD Ameritrade's part.

Finally, under the circumstances presented here -- where all parties agreed, in writing, that TD Ameritrade would not have the duties that are alleged to have been breached, TD Ameritrade did not solicit or initiate the transactions in question, and the alleged damages resulted from market movement entirely beyond TD Ameritrade's control -- even if there were a finding of negligence causing damage, TD Ameritrade should not be liable. *Schlomer by Bye v. Perina*, 485 N.W.2d 399, 402 (Wisc. 1992) (Holding that no liability should be imposed, despite a finding of negligence causing damage, if: "(1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tortfeasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent

claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.").

2. Claimants cannot state a claim against
   TD Ameritrade for "failure to supervise."

FINRA Rule 3110 ("Supervision") requires each broker-dealer to establish and maintain a system to supervise the activities of that broker-dealer's "associated persons" -- its registered representatives, agents and employees.[4] The rule does *not* require broker-dealers to supervise the activities of third parties or the third parties' associated persons.

Neither TD Ameritrade nor its representatives recommended or sold any investment to Claimants. All recommendations, strategies and trading in Claimants' account were conducted by Claimants' independent registered investment advisors.

Sheaff Brock, Two Fish and their registered representatives were not TD Ameritrade's representatives, agents or employees. Neither Sheaff Brock nor Two Fish has ever been affiliated or associated with TD Ameritrade. Accordingly, TD Ameritrade had no duty to supervise the activities of Sheaff Brock, Two Fish or their registered representatives for the benefit of Claimants.

Indeed, it was exactly the other way around: It was Claimants who were obliged to supervise and monitor the Advisors' conduct, because Sheaff Brock and Two Fish were *Claimants'* agents. They engaged Sheaff Brock/ Two Fish, and they appointed those firms and their representatives as their "agent and attorney-in-fact to manage their accounts." (Ex. H.) **Sheaff Brock and Two Fish worked for Claimants.** *Claimants* agreed to be liable for *Sheaff Brock's and Two Fish's* conduct to the extent it injured TD Ameritrade: They

---

[4] This is a paraphrase of the definition of "associated person," set forth in FINRA By-Laws, Art. I, ¶ (rr).

agreed to indemnify and hold TD Ameritrade harmless for any claim that arose out of TD Ameritrade's having relied on Claimant's grants of authority to Sheaff Brock, Two Fish or their representatives, and for any claim that arose out of its execution of the Advisors' instructions. (Ex. H, para. 2.)

3. Claimants cannot state a claim against
TD Ameritrade under the Wisconsin Securities Act.

For a claim Under the Wisconsin Uniform Securities Law, Wis. Stat. §551.509(2) and (3), a plaintiff must establish that the defendant offered him a security, or sold a security to him, or bought a security from him, by means of fraud -- that is, by employing a "device, scheme or artifice to defraud," by making "an untrue statement of a material fact" or omitting "to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," or by engaging "in an act, practice or course of business that operates or would operate as a fraud or deceit upon another person." Wis. Stat. § 551.501.

Accordingly, to state a claim against TD Ameritrade under § 551.509, Claimants must establish (a) that *TD Ameritrade* offered, sold or purchased securities to or from Claimants, and (b) that, in connection with *TD Ameritrade*'s securities purchases from or sales to them, *TD Ameritrade* made "untrue statements of material fact" to them or omitted to tell them material facts necessary to make its statements "not misleading" under the circumstances, or that *TD Ameritrade* engaged in "fraud or deceit" on them.

Claimants cannot establish these elements of their claim. As to the first, TD Ameritrade was not the offeror, seller or purchaser of any securities that Claimants bought or sold. TD Ameritrade is not an issuer or offeror of any securities they transacted; they did not buy any securities pursuant to any securities offering by TD Ameritrade. TD

Ameritrade is not a market maker, and does not engage in any principal or proprietary trading activities. It was not the Claimants' seller or buyer in *any* transaction.

As to the second, since TD Ameritrade had no communications whatsoever with Claimants about any of their securities transactions, it cannot have made any misleading or false statements in connection with those transactions. Claimants contend that TD Ameritrade "implicitly represented" that the options strategy and options transactions that the Advisors developed and implemented were suitable for them, but that contention is inaccurate, and is belied by Claimants' own written acknowledgements to the contrary. For example, Claimants agreed that "All investments involve risk, and unless you [TD Ameritrade] provide individualized recommendations to me, *I or my Advisor are responsible for determining the suitability of any trade, investment, investment strategy* and risk associated with my investments." (Ex. E, para. 4.a. (emphasis supplied).)

As an alternative theory of liability, Claimants invoke DFI-Sec. 7.03 of the Wisconsin Administrative Code, which provides that "any person who places an order or effects a transaction involving the purchase or sale of a security for the account of a customer pursuant to discretionary authority is deemed to be offering or selling or purchasing a security." That claim fails, too, because (as discussed above), this was not a discretionary account. Claimants expressly acknowledged that, "TD Ameritrade has no discretionary authority or control with respect to your assets under management with the Advisor." (*See* Ex. C, Disclosure Form.) Claimants further agreed that their account was "self-directed." (Ex. E, para. 4.a.) Their decision to hire an independent agent to help them self-direct their account does not change its character. As TD Ameritrade had no discretionary authority,

and did not exercise any discretion in Claimants' account, TD Ameritrade did not "effect a transaction ... pursuant to discretionary authority." DFI-Sec 7.03.

D.    This Claim Fails As A Matter Of Law For Additional Reasons.

1.    Claimants have failed to state, and do not have, any claim against TD Ameritrade. TD Ameritrade does not owe the duties allegedly breached. Claimants have failed to state, and do not have, a claim against TD Ameritrade under the Wisconsin Uniform Securities Law, the FINRA Rules, or other law. TD Ameritrade had no duty to supervise the advisors or their representatives. TD Ameritrade made no recommendations to Claimants, so it had no suitability obligations relating to Claimants' securities transactions; therefore, Claimants cannot state, and do not have, any claim against TD Ameritrade arising out of the suitability or alleged unsuitability of the investments they or their agent selected for their accounts. TD Ameritrade promptly sent complete and accurate transaction confirmation notices and account statements to Claimants, so Claimants cannot state, and do not have, a claim against TD Ameritrade relating to any misrepresentation or omission concerning their accounts, transactions or holdings.

2.    Claimants assumed all risk of loss. The risks arising from trading in the securities market are obvious, and were known to Claimants.

3.    Claimants are not entitled to the damages they seek. Claimants' account at issue was profitable on an overall "Net Out of Pocket" basis while they maintained the account at TD Ameritrade. Any losses they incurred on specific transactions were caused by a combination of Claimants' and/or their agents' selection of securities to trade, when to trade and in what amounts, and market forces. TD Ameritrade did not cause any of their alleged losses, and bears no liability for their alleged losses.

4.    Claimants failed to mitigate damages. Claimants could have terminated their relationship with the Advisors or could have directed the Advisors to change their investments at any time if they were concerned about risks or unsatisfied in any way with the transactions the Advisors made on their behalf. Claimants admit that the Advisors engaged in options transactions in their accounts for a long period before the transactions in question. Had they terminated the advisory relationship upon observing the first transaction(s) that they now claim were inappropriate, they would not have experienced the losses they now claim.

5.    Claimants released these claims. In the Client Agreement, they released TD Ameritrade from "any and all liability and claims for damages resulting from any action taken pursuant to this Agreement." (Ex. I.) TD Ameritrade opened and maintained Claimants' account, and processed their transactions, pursuant to the Client Agreement, and accordingly, Claimants released all of these claims.

6.    Claimants ratified all transactions made by the Advisors. When they opened their accounts, they agreed to indemnify TD Ameritrade and to "ratify and confirm any and all transactions... made by [their] Agent for [their] account[s]." (Ex. H, at para. 2.)

7.    Claimants waived all claims against TD Ameritrade by failing to object in a timely manner to transactions set forth on the account statements and transaction confirmations sent to them. Ex. E, section 4.c. *See also Lamm,* 749 F. 3d at 944 (plaintiff's failure to object to transactions reported on defendant custodian's monthly statements waived any claims arising out of those transactions, including those attempting to hold the custodian liable for investment losses sustained on securities transactions the customer's advisor made on his behalf).

8.      There is no basis upon which Claimants could be entitled to an award of punitive damages against TD Ameritrade.  TD Ameritrade is headquartered in Nebraska, and in the Client Agreement, Claimants agreed that Nebraska law would govern.  Punitive damages are not permitted under Nebraska law.  *See, e.g., Distinctive Printing and Packaging Co. v. Cox*, 443 N.W.2d 566, 574 (Neb. Sup. Cr. 1989) ("punitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction.")  Even if Wisconsin law were applied, however, punitive damages would be unavailable here. Wisconsin permits punitive damages awards only if "evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff."  Wisc. Stat. § 895.85(3).  In enacting this statutory standard, "the legislature intended to create a <u>higher</u> standard than that at common law."  *Henrikson v. Strapon*, 758 N.W.2d 205, 210 (Wisc. 2008) (Emphasis added). The common law standard for punitive damages was that the person's conduct was outrageous, meaning that the person acted either maliciously or in wanton, willful and in reckless disregard of the plaintiff's rights.  *Id.* at 211. Thus, in order to recover punitive damages under Wisconsin law, the Claimants must prove that TD Ameritrade's conduct was *worse than outrageous* -- that TD Ameritrade acted maliciously,  motivated by "hatred, ill will, a desire for revenge, or inflicted under circumstances where insult or injury is intended."  *Unified Catholic Schools of Beaver Dam Educ. Ass'n v. Universal Card Servs. Corp.*, 34 F. Supp. 2d 714 (E.D. Wisc. 1999).  As TD Ameritrade did not act with this sort of malice toward Claimants in any respect, at any time, Claimants can never meet the mandatory legal standard for an award of punitive damages against TD Ameritrade.

9. There is no basis upon which Claimants could be entitled to an award of attorney's fees against TD Ameritrade. By contract, the *Claimants* are obligated to indemnify *TD Ameritrade* for *its* costs and expenses. If any award of attorney's fees is to be entered, it should be *in favor of TD Ameritrade and against the Claimants.*

CLAIM OF TD AMERITRADE CLEARING, INC.,
AGAINST SHELDON S. FERKEY, JUDITH M. FERKEY, THE SHELDON S.
FERKEY AND JUDITH M. FERKEY REVOCABLE TRUST, SHEAFF BROCK
INVESTMENT ADVISORS, LLC, AND TWO FISH MANAGEMENT, LLC,
FOR INDEMNIFICATION

1. TD Ameritrade Clearing, Inc., brings this claim for indemnification against Sheldon S. Ferkey, Judith M. Ferkey, the Sheldon S. Ferkey And Judith M. Ferkey Revocable Trust, Sheaff Brock Investment Advisors, LLC, and Two Fish Management, LLC.

2. Sheldon S. Ferkey and Judith M. Ferkey were the owners of the account at issue in this case from its inception in September 2012 until they transferred ownership to the Sheldon S. Ferkey And Judith M. Ferkey Revocable Trust on March 14, 2014. Thereafter, the Trust owned the account at issue. Mr. and Mrs. Ferkey are its Trustees. Upon opening the account, they agreed to arbitrate all disputes with TD Ameritrade and any of its affiliates arising out of or relating to the Client Agreement, the parties' relationship, any services provided to them, or their use of the services. *See* Ex. E. Upon transferring the account to the Trust, they agreed on its behalf to the same arbitration clause. *See* Ex. I. Accordingly, Mr. and Mrs. Ferkey and the Trust are required to arbitrate the dispute set forth in this claim.

3. Sheaff Brock Investment Advisors, LLC, is an Indiana limited liability company.

4. Two Fish Management, LLC, is an Indiana limited liability company.

5.     Pursuant to the agreements between Sheaff Brock/ Two Fish and TD Ameritrade, the Advisors are required to arbitrate the dispute set forth in this claim. *See* Ex. A and Ex. B.

6.     When Mr. and Mrs. Ferkey opened their joint Institutional account with TD Ameritrade Clearing, Inc., to be managed by Sheaff Brock and Two Fish, they executed two Limited Powers Of Attorney, in each of which they agreed "to indemnify and hold harmless TD Ameritrade, its affiliates and their directors, officers, employees, and agents from and against any and all claims, actions, costs, and liabilities, including attorney's fees, arising out of or related to reliance on this authorization and to pay promptly on demand any and all losses arising therefrom or debit balance due thereon." They further agreed that "This authorization and indemnity is in additional to, and in no way limits or restricts, any rights which you [TD Ameritrade] may have under any other agreement or agreements between the undersigned and TD Ameritrade." (Ex. H.)

7.     This claim arises directly out of, and relates to, TD Ameritrade's reliance on Mr. and Mrs. Ferkey's authorization to accept and follow the transaction instructions submitted to it by their agents, Sheaff Brock and Two Fish. Accordingly, they are obligated, pursuant to each Limited Power of Attorney, to indemnify TD Ameritrade for all costs, and liabilities, including attorney's fees, that it incurs in connection with this arbitration.

8.     In addition, upon opening their Institutional account, and again when instructing TD Ameritrade to change the title of the account to reflect ownership by the Trust, Mr. and Mrs. Ferkey, in their individual capacities and as Trustees of the Trust, agreed to be bound by the terms of the Client Agreement (Ex. E), which provides, at paragraph 14.h.:

> **Indemnification.** I agree to indemnify and hold harmless you, your affiliates, and Third-Party Providers and their respective officers, directors, employees, agents, and representatives from any and all liabilities, losses, costs, judgments, penalties, claims, actions, damages, expenses, or attorney's fees (collectively "Losses") resulting or arising directly or indirectly from my use of the Services.

"Services" is defined to include the brokerage services necessary to place transactions in the client's account. (*See* Ex. E, para. 2, "Definitions.")

9. This claim results or arises from Mr. and Mrs. Ferkey's and the Trust's use of the brokerage services provided by TD Ameritrade. Accordingly, they are obligated, pursuant to the Client Agreement, to indemnify TD Ameritrade for all liabilities, costs, expenses, or attorney's fees, etc., that it incurs in connection with this arbitration. Their failure to indemnify TD Ameritrade constitutes a breach of contract.

10. Sheaff Brock and Two Fish each agreed to indemnify TD Ameritrade and hold it harmless from and against any and all claims, actions, costs and liabilities, including without limitation attorney's fees, arising out of or relating to the performance or nonperformance of Sheaff Brock's/ Two Fish's services, or any dispute between Sheaff Brock/ Two Fish and any client, including disputes relating to their investment decisions. *See* Ex. A ("Indemnification") and Ex. B, para. 10.

11. Sheaff Brock has acknowledged and reaffirmed its indemnification obligations toward TD Ameritrade, and is honoring them. It is TD Ameritrade's understanding that there is a possible dispute between Two Fish and Sheaff Brock as to which firm may have indemnification obligations to the other. TD Ameritrade takes no position with regard to that issue.

12. With respect to TD Ameritrade, however, Claimants and their agents, Sheaff Brock and Two Fish, should be held liable, jointly and severally, to TD Ameritrade for its

costs and expenses incurred in connection with this case. Claimants made the same commitment as the Advisors did -- to indemnify TD Ameritrade from any claims arising out of or relating to their relationships with their Advisors, or the Advisors' services to them -- so it would not be fair for the Advisors, or either of them, to bear the entire indemnification obligation.

THEREFORE, Respondent TD Ameritrade Clearing, Inc., respectfully requests that:

(a) all claims by Claimant Sheldon S. Ferkey And Judith M. Ferkey Revocable Trust be denied in their entirety and dismissed, and

(b) that the Panel enter an Award in its favor and against Sheldon S. Ferkey, Judith M. Ferkey, the Sheldon S. Ferkey And Judith M. Ferkey Revocable Trust, Sheaff Brock Investment Advisors, LLC, and Two Fish Management, LLC, jointly and severally, for reimbursement of all FINRA fees, attorney's fees, and any and all other liabilities, losses, costs, judgments, penalties, claims, actions, damages, and expenses it incurs in connection with this case, in an amount to be proved at the hearing and supplemented by affidavit or other appropriate submission after the conclusion of the hearing.

Respectfully submitted,

Dana Sirkis Gloor
MILES & STOCKBRIDGE, P.C.
100 Light Street
Baltimore, MD 21202
410.385.3849
dgloor@milesstockbridge.com

Attorneys for TD Ameritrade, Inc.

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this 13th day of January 2017, I served via electronic mail *only* a copy of the foregoing Answer and its attached Exhibits upon:

Michael Schaalman, Esq.
Halling & Cayo, SC
mhs@hallingcayo.com

    *Counsel for Sheldon S. and Judith M. Ferkey Revocable*
    *Trust, Sheldon S. Ferkey and Judith M. Ferkey*

Ronald P. Kane, Esq.
Kane & Fischer, Ltd.
rkane@kfltd.com

    *Counsel for Sheaff Brock Investment Advisors, LLC*

Brian A. Carlis, Esq.
Stark & Stark
bcarlis@stark-stark.com

    *Counsel for Two Fish Management, LLC*

Dana Sirkis Gloor



**TD WATERHOUSE**
Institutional Services

100 Wall Street • New York, NY 10005
1-800-431-3500

*VQV/VQN* *Review LLC*

*05-15*

# ADVISOR MASTER ACCOUNT AND
# SUB-ACCOUNT APPLICATION

## 1 PERSONAL INFORMATION

| Firm Name | E-mail |
|---|---|
| SHEAFF BROCK INVESTMENT ADVISORS LLC | DAVEG @ SHEAFFBROCK.COM |

| Address: (Cannot be a P.O. Box) | Mailing Address: (if different) |
|---|---|
| 10401 N. MERIDIAN ST. SUITE 130 | |

| Address: City / State / Zip Code | Mailing Address: City / State / Zip Code |
|---|---|
| INDIANAPOLIS, IN 46290 | |

| 1st Contact Name | e-mail | 2nd Contact Name | e-mail |
|---|---|---|---|
| DAVE GILREATH | SAME ABOVE | RON BROCK | RONB @ SHEAFFBROCK |

| 1st Contact | 2nd Contact |
|---|---|
| Phone (317) 705-5101   Fax (317) 705 5110 | Phone (317) 705-5105   Fax (317) 705-5110 |

## 2 TYPE OF REGISTRATION (PLEASE CHECK ONLY ONE)

☐ Corporation *(Complete the Corporation Agreement form & give tax ID# below)*  ☐ Partnership *(Complete the Partnership Authorization form & give tax ID# below)*
☒ L.L.C. *(Enclose your Operating Agreement or Certificate of Limited Liability filed with your state & give tax ID# below)*
☐ Sole Proprietor *(Give Soc. Sec.# or tax ID# below)*

## 3 FIRM TAX ID OR REPRESENTATIVE SOCIAL SECURITY NUMBER

## 4 TYPE OF BUSINESS, DESIGNATIONS, AND AFFILIATIONS (CHECK ALL THAT APPLY)

☒ Registered Investment Advisor *(Enclose Form ADV, Parts 1 & 2 & all Schedules)*
☐ Trust Company                                                    ☐ Bank Trust Company
☐ NASD Registered Rep (Complete B/D info. directly below)          ☐ Broker/Dealer
☐ Check here if your B/D has approved doing fee-based business with TD Waterhouse Institutional Services. ___ *Specify Name of B/D*
☐ NAPFA     ☒ CFP     ☐ CPA     ☐ Attorney     ☐ Ins. Broker     ☐ CLU     ☐ CFA
☐ IAFP      ☐ JCFP    ☐ AICPA   ☐ CPA/PFS      ☐ CHFC                        ☐ Other ___
For NASD Compliance: ☐ Send duplicate confirms & statements to Broker/Dealer

*OPENED BY WIS-SAN DIEGO*
*DATE 11/6/01*
*VICKI O'HARA #710*

*11/6/01*

| Broker/Dealer Name: | Attention: |
|---|---|
| *First          M.I.          Last* | |
| Mailing Address: | Mailing Address: City / State / Zip Code |

## 5 FOR MANAGEMENT FEE DEDUCTION SERVICE/ADVISOR MASTER ACCOUNT

If you are a representative of a B/D or an RIA that currently works with TD Waterhouse Institutional Services, include Rep.# here ___
TD Waterhouse to deduct client management fees? ☒ Yes *(Choose A, B, C, or D below)*   ☐ No
☐ A. Mail Check Immediately                       ☐ C. Remit Funds Electronically via ACH *(additional paperwork required)*
☒ B. Sweep to Money Market Vehicle *(choose below)*   ☐ D. Remit Funds to Broker/Dealer
☐ TD Waterhouse Bank, N.A.–FDIC-Insured Money Account    ☒ Money Market Portfolio*
☐ Municipal Portfolio*                                   ☐ No Money Market
☐ American AAdvantage® Money Market Platinum Class℠ *(additional paperwork required)*   ☐ U.S. Government Portfolio*

## 6 CLIENT STATEMENTS:

Please indicate the name of your firm as it should appear on your client statements (maximum 20 characters.)

| S | H | E | A | F | F | | B | R | O | C | K | | I | N | V | | A | D | V |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

I have read, understand and agree to be bound by the terms of the enclosed Customer Agreement. *The enclosed Customer Agreement contains a pre-dispute arbitration clause. (Please see paragraph #9 of the Customer Agreement for full details.)*

Authorized Signature ___ *David S. Gilreath* ___ Date ___ *10/24/01*

Please Print Name ___ DAVID S. GILREATH

To TD Waterhouse Investor Services, Inc./National Investors Services Corp. Under the penalties of perjury, I certify that the number shown on this form is the correct taxpayer ID number, and that I am not subject to withholding because (a) I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (b) the Internal Revenue Service has notified me that I am no longer subject to backup withholding. Note: You may strike out any part of this statement that does not apply.

* The TD Waterhouse Investors Cash Management Funds are neither FDIC-insured nor guaranteed by the U.S. Government and are not deposits or obligations of, or guaranteed by, any bank. There can be no assurance that these funds will be able to maintain a stable net asset value of $1 per share.

American Airlines and AAdvantage are registered trademarks of American Airlines, Inc. American AAdvantage Money Market Platinum Class℠ are service marks of AMR Investment Services, Inc.

x ___ *David S. Gilreath* ___ *10/24/01* ___ x ___
Signature of principal, officer, or other authorized person   Date        Signature of Representative (sign if party of Umbrella RIA)   Date

*VERIFIED BY WIS-SAN DIEGO*
*ADP / *
*ORACLE # ___ 11/7/01*

### For TD Waterhouse Use Only

| Date ___ | ADV ___ | Corp res ___ | Sole Prop ___ | Part Agree ___ | L.L.C. ___ | Emp# ___ |
|---|---|---|---|---|---|---|

*$710 mgt cert, LLC op agmt*

# TD WATERHOUSE INSTITUTIONAL SERVICES
## AGREEMENT

**GENERAL:** TD Waterhouse Investor Services, Inc. ("TD Waterhouse") will provide discount brokerage services through its Institutional Services to the Advisor and its bona fide Clients. TD Waterhouse will not make investment recommendations or decisions, nor offer investment, legal, or tax advice. TD Waterhouse is not responsible for reviewing, supervising, or monitoring investment decisions or other activity in the Client's account.

**REGISTRATION:** Advisor represents, and warrants that it is duly registered with the appropriate state and federal agencies, and that it will notify TD Waterhouse if it ceases to be registered. Advisor agrees to provide to TD Waterhouse (i) the Form ADV Parts I & II, including applicable Schedules and (ii) a state or federal verification of registration. Advisor agrees to provide timely copies of (i) any amended registration documents, (ii) the annual state or SEC renewal and (iii) copies of any regulatory audit reports.

**STATIONERY AND ADVERTISEMENTS:** Advisor agrees to provide upon request of TD Waterhouse, and TD Waterhouse reserves the right to approve, the following documentation used in the Advisor's business including, but not limited to, stationery, business cards, brochures, advertisements and electronic (web page) media collectively, "sales material". Advisor further agrees to provide to TD Waterhouse any and all amended sales material within 30 days of its usage.

**CREDIT REPORTS:** Advisor authorizes TD Waterhouse to obtain the Advisor's regulatory record through the Compliance Data Center, NASD, or other regulator. Advisor also authorizes, a credit report through TRW, or other reporting agency. If Advisor's Agreement with TD Waterhouse is terminated or Advisor is denied a benefit within the last 60 days and a credit report was used in the decision process, Advisor is entitled to a free copy of the credit report upon request.

**PAYMENT OF MANAGEMENT FEES AND EXPENSES:** If the Client has authorized TD Waterhouse in writing to do so and upon presentation of an invoice from the Advisor, TD Waterhouse will debit the Client's account to the extent of available money fund or cash balances for the amount of management or advisory fees owed by the Client. TD Waterhouse may suspend this practice at any time with respect to any or all Client accounts. TD Waterhouse is not liable for nonpayment of management or advisory fees. Clients may transfer or withdraw assets without prior notice. The Advisor agrees to provide TD Waterhouse with true and accurate invoices of the management or advisory fees owed by the Client, and to send the Client simultaneous written notification of the amount invoiced to TD Waterhouse showing the amount of the fee, the value of the assets upon which the fee is based, and the specific manner in which the fee was calculated. The Advisor further agrees that the invoice provided to the client will include language to the effect: "It is the client's responsibility to verify the accuracy of the fee calculation. The custodian (TD Waterhouse) is not responsible for the calculation or verification of the fees due".

**ADVISOR'S RELATIONSHIP TO TD WATERHOUSE:** Advisor and its representatives will not represent or imply in any way: (1) that TD Waterhouse and the Advisor are affiliated or have any relationship except as described in this Agreement; (2) that TD Waterhouse endorses or recommends the Advisor; (3) that TD Waterhouse provides investment oversight; or (4) that TD Waterhouse monitors, approves or reviews the Advisor, its representatives, its investment decisions, suitability determination, or its trading activity. Advisor agrees to meet with TD Waterhouse Institutional Services at Advisor's place of business upon request.

**INDEMNIFICATION:** The Advisor and its representatives indemnify and hold harmless TD Waterhouse, its affiliates, directors, officers, employees, and agents from and against all claims, actions, costs, and liabilities, including attorney's fees, arising from or relating to:

1. any breach by the Advisor of any provision of this Agreement;
2. the performance or non-performance, delivery or non-delivery of the Advisor's services to the Client;
3. any dispute between the Advisor and any Client, including disputes concerning fees and investment decisions.

**ASSIGNMENT:** This agreement is not assignable without prior written consent except that TD Waterhouse may assign its rights and obligations under this Agreement to any subsidiary, affiliate, or successor by merger consolidation without notice to the Advisor. The Advisor agrees to notify TD Waterhouse prior to assigning this Agreement.

**TELEPHONE MONITORING:** TD Waterhouse may record telephone calls to monitor the quality of service and to verify securities transactions.

**CUSTOMER AGREEMENT:** The enclosed Customer Agreement contains a pre-dispute arbitration clause. I have read and received a copy of the customer agreement. (Please see paragraph #9 of the Customer Agreement for full details.)

**TERMINATION OF THE AGREEMENT:** TD Waterhouse reserves the right to terminate the Agreement and to notify the Advisor's clients of any of the following: (1) any material breach of the Advisor's Master Account Agreement, (2) termination of the Advisor's registration, (3) sanctions imposed by regulatory agencies, (4) dissolution of the Advisor due to death or other causes, (5) unsecured customer account debits, (6) unresolved conflicts of interest. Documentation may be required to reflect changes in ownership and authorizations to continue to transact business (resolution form, articles of incorporation, operating agreements or trading authorizations.)

**ENTIRE AGREEMENT:** This agreement constitutes the entire agreement between the parties concerning the subject matter hereof, supersedes any previous agreement, and may be amended or modified only by a writing signed by both parties. Advisor understands that mutual fund information provided by TD Waterhouse is subject to change without notice. Advisor also acknowledges the responsibility to review each prospectus prior to purchase and agrees that its clients are responsible for charges disclosed in the prospectus.





THIS AGREEMENT, dated as of this 10th day of April, 2001 by and between TD Waterhouse Investor Services, Inc. ("TD Waterhouse") and Sheaff Brock Investment Advisors LLC a registered investment advisor (the "Advisor").

WHEREAS, TD Waterhouse is a discount brokerage firm which provides various financial services to individual investors; and

WHEREAS, TD Waterhouse has established the TD Waterhouse AdvisorDirect (the "Program") as a means of referring its discount brokerage customers and other investors (collectively "Investors") to independent investment advisors; and

WHEREAS, Advisor desires to be a participant in the Program;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, TD Waterhouse and Advisor hereby agree as follows:

1. **Advisor Participation Criteria**

   As a condition of participation in the Program, Advisor represents and agrees that it meets and will, throughout the term of this Agreement, continue to meet the following criteria:

   (a) *Fee-Based Advisory Services.* Advisor is predominantly a fee-based advisor with respect to management of individual accounts who provides investment supervisory services for an asset-based fee or flat rate fee, and whose receipt of compensation for its services directly or indirectly from commissions, loads or other sales charges (including 12b-1 fees) for the placement of financial services or products to Investors introduced by the Program who enter into advisory agreements with Advisor (hereinafter "Clients") is only incidental to Advisor's fee-based investment advisory business.

   (b) *Licensing and Registration.* Advisor is, and has been at all times during the past three (3) years, registered as an investment advisor with the Securities and Exchange Commission ("SEC") or with all applicable state regulatory authorities (each an "Applicable Regulatory Authority"). Advisor and all persons who are associated with or employed by Advisor have satisfied, and shall, throughout the term of this Agreement, continue to satisfy, all applicable filing, fee, licensing, registration and qualification requirements.

   (c) *Investment Experience.* The supervisory representatives of Advisor who determine the general investment advice given to Clients (the "Advisory Supervisors") have a minimum of five years' experience managing money and investments as a primary occupation, which experience may include work as a registered representative, portfolio manager or financial planner.

   (d) *Education.* Advisory Supervisors of Advisor have earned the Chartered Financial Analyst designation, or have a four-year college degree, or have ten (10) years of experience managing investments.

   (e) *Disciplinary History.* All disciplinary items, if any, have been disclosed as required on Form ADV, Part I and neither Advisor nor any of its advisory affiliates, as that term is defined in the instructions to Form ADV ("Affiliates"), are the subject of any undisclosed proceeding, nor to the best of Advisor's knowledge are any proceedings threatened, which would require a "yes" answer to any of the questions contained in Part I, Item 11 of Advisor's Form ADV. A "yes" answer resulting from late or incomplete payment of registration fees, or the filing of applications or marketing materials that were subsequently corrected, modified or completed as required by federal or state regulatory bodies and which TD Waterhouse has determined were inadvertent shall not be deemed "yes" for purposes of this provision.

   (f) *Bankruptcy.* In the ten (10) years immediately preceding the date of this Agreement, neither Advisor, nor any of its directors, Advisory Supervisors, persons advising clients, persons owning 10% or more of Advisor, any of its Affiliates, or any business with which any of the preceding persons have been affiliated, has failed in business, made a compromise with creditors, filed a bankruptcy petition, been declared bankrupt or, if a broker-dealer, had a trustee appointed under the Securities Investor Protection Act or had a direct payment procedure commenced.

   Advisor hereby authorizes TD Waterhouse to conduct, or to retain a third party to conduct, any credit, regulatory, criminal or other background check or investigation of Advisor, and upon request will provide TD Waterhouse with written authorizations from its principals, officers, employees or other persons associated with Advisor, permitting such checks or investigations. TD Waterhouse may but shall not be obligated to provide Advisor or others with the results of any such check or investigation upon Advisor's request.

   Advisor acknowledges that it shall have no vested right or otherwise be entitled to participate in the Program even if Advisor meets the minimum participation criteria specified herein or as amended. TD Waterhouse may, in its sole discretion, waive, in whole or in part, the foregoing criteria, but shall have no obligation to do so. Advisor acknowledges and agrees that any or all criteria for participation in the Program may be amended from time to time, in TD Waterhouse's sole discretion, without cause or advance notice to Advisor.

2. **Information to be Provided by Advisor**

   Advisor agrees to provide TD Waterhouse with the following documents:

   (a) An Investment Manager Profile Sheet (the "Profile"), description of Advisor's advisory services.

   (b) Advisor's most current ADV including all schedules.

   (c) Advisor's arbitration disclosure, consisting of a written description of any arbitration, whether pending or final, filed any time within the past ten (10) years against the Advisor, its principals, officers, directors, employees, all other persons associated with Advisor and any broker/dealer with which Advisor is affiliated ("Advisor's Arbitration Disclosure"). Advisor's Arbitration Disclosure shall include the date on which any such action was filed, its current status, and a detailed description of the nature of the claim and the dollar amount involved.

(d)  If Advisor answers "yes" to any part of Question 11 of Part 1 of Advisor's Form ADV, Advisor shall provide a copy of Advisor's explanation of such "yes" answer which shall be documented on Schedule E to Advisor's Form ADV.

Within thirty (30) days after receiving approval to participate in the Program, Advisor shall amend its Advisor Brochure to disclose (i) its participation in the Program; (ii) potential conflicts of interest that may arise from participation in the Program; and (iii) that the duty of "best execution" is not eliminated by participation in AdvisorDirect. Advisor agrees to comply with all applicable requirements of Advisers Act 204-3 (the "Brochure Rule") and applicable similar state requirements. Advisor shall be responsible for all costs and expenses related to preparation and updating of its Profile, Advisor Brochure and other information provided to the Program.

Advisor shall, so long as it participates in the Program or advises Clients introduced through the Program, maintain its registration as an investment advisor with the Applicable Regulatory Authority and shall promptly amend and update its registration documents as required by applicable law. Advisor shall furnish to TD Waterhouse, no later than ten (10) days after filing with the Applicable Regulatory Authority, copies of all amendments to its Form ADV and annual reports on Form ADV-S. Advisor shall notify TD Waterhouse in writing within twenty-four (24) hours by facsimile, confirmed by mail, in the event its Profile becomes inaccurate or incomplete and shall provide TD Waterhouse with revised Profile within five (5) business days and at least annually shall provide TD Waterhouse with an updated Profile. Advisor shall provide TD Waterhouse with a list of states where Advisor is registered/or submitted notice filings as an investment advisor and shall notify TD Waterhouse immediately of any additions to or deletions from that list. Advisor shall immediately notify TD Waterhouse of any change in its status or ability to act as an investment advisor under either federal or state law, including the need to answer "yes" to questions in item 11 of Advisor's Form ADV, Part 1 or the naming of Advisor as defendant in any criminal, civil, administrative, remedial or enforcement action brought by federal, state or self-regulatory authorities or any private civil action initiated by any present or former Client of Advisor.

If any information furnished by Advisor to TD Waterhouse or Clients in connection with the Program, including without limitation the Profile, advisor questionnaire, Advisor Arbitration Disclosure, Advisor Brochure, Forms ADV and amendments thereto, becomes inaccurate, false or otherwise misleading, Advisor shall immediately notify TD Waterhouse and shall take all appropriate action to correct such inaccuracy, falsehood or misstatement. Advisor shall assume all costs and expenses associated with such changes, amendments or updates. Advisor acknowledges that TD Waterhouse, the Investors and Clients will be relying upon Advisor for the truthfulness, completeness and accuracy of all information furnished by Advisor to the Program as well as to the Investors and Clients.

## 3.  Responsibilities of Advisor

Advisor agrees to grant an initial personal interview, free of charge, to each Investor referred by the Program who so requests. Before accepting any Investor as a Client, Advisor agrees to determine whether discretionary investment advice is suitable for such Investor and, if so, to determine the Investor's investment objectives and needs by way of written client questionnaire or other appropriate means.

If an Investor referred to Advisor by the Program is not accepted as a Client by Advisor or elects not to retain Advisor, Advisor will not recommend, or refer the Investor to, any other investment advisor or provider of financial products or services. Upon request by TD Waterhouse, Advisor will inform TD Waterhouse promptly of the status of all referrals to Advisor by the Program.

Advisor will manage the investment and reinvestment of Client assets (the "Accounts") at TD Waterhouse in a manner consistent with Client's investment objectives and needs. Advisor agrees to follow all policies and procedures of the Program as TD Waterhouse may establish from time to time.

Advisor shall not maintain custody or possession of Client funds or securities within the meaning of Rule 206(4)-2 under the Advisers Act or other applicable laws and rules.

Advisor shall not place orders which exceed its authority under any agreement between Advisor and any Client. Advisor may request but will not require its Clients to authorize TD Waterhouse to pay investment management fees and expenses directly to Advisor.

## 4.  Responsibilities of TD Waterhouse

TD Waterhouse shall provide to each Investor who receives a referral to an Advisor under the Program a current copy of the Advisor Profile.

Advisor acknowledges and agrees that the procedures employed by the Program to identify advisors and furnish information to Investors may change from time to time in TD Waterhouse's sole discretion. Advisor acknowledges that TD Waterhouse has no obligation to furnish information about Advisor to any Investor or to allow Advisor to continue to participate in the Program.

TD Waterhouse has designed the Program as an information resource for brokerage customers and investors who seek fee-based personal investment management. In creating the Program, TD Waterhouse has not undertaken any obligation to allow any advisor to participate in the Service. All criteria or other requirements TD Waterhouse may impose relating to the participation of advisors in the Service are subject to change from time to time by TD Waterhouse in its sole discretion, without cause or advance notice. TD Waterhouse will not determine whether personal investment management by Advisor is suitable for investors who contact Advisor, and TD Waterhouse is not obligated to monitor future trading activity in Advisor's Clients' accounts to ensure that Advisor's services are or remain suitable for Advisor's Clients. Such determinations and monitoring are and shall remain the sole responsibility of Advisor and its Clients.

Advisor acknowledges that TD Waterhouse shall be entitled, but not obligated, to communicate directly with Clients of Advisor referred by the Program or who maintain brokerage accounts with TD Waterhouse.

## 5.  Representations and Warranties of Advisor

Advisor hereby represents and warrants as follows:

(a)  Advisor is registered as an investment advisor with the Applicable Regulatory Authority and, to the extent any law requires registration, licensing or other qualification of Advisor's officers, directors, employees, agents or Affiliates, or payment of fees or filing of documents, they are in compliance with same and shall remain in compliance during the term of this Agreement.

(b)  Advisor is duly organized and validly existing, with full power and authority to conduct an investment advisory business and to enter into this Agreement. This Agreement is a valid and binding obligation of Advisor, enforceable in accordance with its terms. All persons signing this Agreement on Advisor's behalf possess full power and authority to do so.

(c) Advisor meets the participation criteria as set forth in Section 1. Advisor represents and warrants that it has the financial resources, personnel and organizational requisites to perform its obligations under this Agreement and agrees to notify TD Waterhouse and its Clients of any change in its circumstances which would adversely impact its ability to perform its obligations hereunder.

(d) The execution and delivery of this Agreement and the terms, provisions and obligations herein do not constitute a breach or violation under any instrument or agreement by which Advisor is currently or may in the future be bound, or a breach or violation of or default under any court, government agency or self-regulatory body or organization order, statute, rule or regulation applicable to Advisor or its Affiliates is or to which any of Advisor's property or assets is or may be subject which will result in any material adverse change in its business or condition (financial or otherwise) or might adversely affect any of its property or assets or its power, authority or ability to act as an investment advisor.

(e) Except as expressly disclosed on Advisor's Form ADV and/or in Advisor's Arbitration Disclosure, Advisor represents and warrants that here is no action, suit or proceeding before or by any court, government agency or self-regulatory body or otherwise, now pending, or to the knowledge of Advisor, threatened against or affecting Advisor or its property which might result in a material adverse change in the condition, financial or otherwise, or business prospects of Advisor.

(f) Advisor represents and warrants that its investment practices do not and will not violate any federal or state laws or rules or the rules of any self-regulatory body overseeing the business of Advisor. Advisor shall comply with all applicable state and federal laws and rules, including the Advisers Act and similar state laws.

(g) Advisor agrees to maintain, update and preserve all records required by the Advisers Act or other applicable laws or rules and to make such records related to TD Waterhouse accounts available to TD Waterhouse at TD Waterhouse's reasonable request.

(h) Advisor represents, warrants and agrees that neither Advisor nor the accounts managed by Advisor are required to be registered as investment companies under the Investment Company Act of 1940, nor are the interests in such accounts required to be registered under the Securities Act of 1933.

(i) Advisor represents and agrees that only it will have investment discretion with respect to Clients' accounts within the meaning of Section 13(f) of the Securities Exchange Act of 1934 and that Advisor shall be responsible for filing any required reports with the SEC pursuant to Section 13(f) and the rules thereunder.

(j) Advisor represents, warrants and agrees that any compensation that Advisor or any of its affiliates receives from commissions, loads or other sales charges (including 12b-1 fees) for the placement of financial products or services with Clients is only incidental to Advisor's fee-based investment management business. Advisor represents that the fees charged to Clients do not exceed those customarily charged by Advisor for comparable services in the area where Advisor markets its services.

(k) Advisor represents and warrants that all information contained in the Profile, the Advisor Brochure and the Advisor's Arbitration Disclosure will be true, accurate and complete at the time it is delivered and that Advisor will correct any such information as required by this Agreement if it becomes inaccurate, incomplete, false or otherwise misleading.

## 6. Representations and Warranties of TD Waterhouse

TD Waterhouse hereby represents that it is duly organized and validly existing under the laws of the State of New York with full power and authority to enter into this Agreement. All persons signing this Agreement on behalf of TD Waterhouse possess full power and authority to do so.

## 7. Relationship of the Parties

Advisor will not represent or imply in any way to Clients, Investors or others that Advisor or any of its principals, officers or employees is an officer, director, employee, agent, or representative of TD Waterhouse. Advisor will not represent or imply in any way that TD Waterhouse and Advisor are affiliated, that TD Waterhouse endorses, recommends or sponsors Advisor, that TD Waterhouse provides investment advice hereunder, or that TD Waterhouse participates in or reviews Advisor's investment or trading decisions or recommendations.

## 8. Marketing

Neither Advisor nor TD Waterhouse shall use the name of the other in connection with the Program or otherwise without first obtaining prior written consent.

Advisor agrees to assist and cooperate with TD Waterhouse and its agents or contractors in conducting, among other things, initial and periodic customer satisfaction surveys of clients introduced through the Program.

## 9. ERISA Accounts

Advisor understands that certain of its Clients may be subject to the Employee Retirement Income Security Act of 1974 ("ERISA") and the regulations thereunder. Advisor acknowledges that as to those Accounts it will act in a fiduciary capacity and as an investment manager as those terms are defined in ERISA. Advisor represents and warrants that, for Accounts subject to ERISA, Advisor will at all times manage the investments in such Accounts in accordance with the provisions of ERISA and any rules thereunder. Advisor shall, at the time each such account is opened, and from time to time thereafter as required by ERISA and the regulations thereunder, send to all such Clients an acknowledgment that Advisor is acting in a fiduciary capacity.

## 10. Indemnification

Advisor hereby agrees to indemnify and hold harmless TD Waterhouse, its affiliates and the directors, officers, employees and agents of TD Waterhouse and its affiliates from and against all claims, actions, costs and liabilities, including without limitation reasonable attorneys' fees, arising out of or relating to (i) any breach by Advisor of any provision of this Agreement, including representations and warranties; (ii) the performance or nonperformance of Advisor's services; (iii) any violation of applicable law or rules by Advisor; (iv) any dispute between Advisor and any Client, including disputes concerning fees and investment decisions; or (v) any losses incurred as the result of errors made by Advisor in transmitting Client Account orders to TD Waterhouse for execution, or as the result of acceptance of any order for a Client Account from Advisor after Client has given Advisor notification of revocation of Client's trading authorization in favor of TD Waterhouse except in each case for such claims, actions, costs and liabilities that arise from TD Waterhouse's own gross negligence or willful misconduct.

Advisor acknowledges and agrees that the foregoing indemnity shall survive any termination of this Agreement by TD Waterhouse or Advisor for any reason.

## 11. Arbitration

Advisor agrees to settle by arbitration any controversy between it and TD Waterhouse, its affiliates, and their respective officers, directors, employees, or agents, which controversy relates to this Agreement, the Participation Agreement, a Client's TD Waterhouse Brokerage Account Agreement, a Client's brokerage account or account transactions, or in any way arising out of an Advisor's relationship to TD Waterhouse. Such arbitration shall be submitted to arbitration conducted only under the provisions of the Constitution and Rules of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration of the National Association of Securities Dealers, Inc. Arbitration must be initiated by service upon the other party of a written demand for arbitration or notice of intention to arbitrate. Any award rendered by the arbitrator will be final and judgment on it may be entered in any court having jurisdiction. This arbitration agreement shall be enforced and interpreted exclusive in accordance with applicable federal law, including the Federal Arbitration Act.

## 12.  Termination

This Agreement shall remain in effect until terminated as provided in this Section.

Advisor may terminate its participation in the Program at any time by providing thirty (30) days prior written notice to TD Waterhouse. Advisor may terminate its participation without prior notice if TD Waterhouse amends the criteria for participation in the program, alters the procedures employed by the program to identify advisors and furnish information to investors or otherwise modifies this Agreement. Advisor's agreements with Clients shall provide that Clients may terminate their arrangements with Advisor for any reason and without penalty at any time. Advisor understands and agrees that any existing trading authorization from its Clients will not be honored by TD Waterhouse from the time TD Waterhouse becomes aware that any Client has revoked the same. Advisor agrees to refund pro rata any advisory fees which have been prepaid by Clients.

TD Waterhouse may terminate this Agreement at any time in its sole discretion without cause or advance notice thereof.

Advisor's obligations with respect to Sections 2, 5, 6 and 11 shall remain in full force and effect in the event of any termination by TD Waterhouse or Advisor for any reason. If this Agreement is terminated for any reason, TD Waterhouse may notify Clients of any matters related to such termination but is not obligated to do so.

## 13.  Notice

Any notice required by this Agreement shall be deemed adequately given upon receipt in writing by letter, wire or telecopy, properly addressed, if to Advisor, to its business address as provided below and, if to TD Waterhouse, to: Mark J. Avers, First Vice President, TD Waterhouse Institutional Services, 100 Wall Street, New York, NY 10005.

## 14.  Assignment

TD Waterhouse may assign its rights and obligations hereunder to any subsidiary, affiliate or successor by merger or consolidation without notice to Advisor, or to any other entity after thirty (30) days prior written notice to Advisor. Advisor may not assign this Agreement without TD Waterhouse's prior written consent, which consent may be withheld by TD Waterhouse in its sole discretion. This Agreement is binding upon and will inure to the benefit of the parties' respective successors and assigns.

## 15.  Miscellaneous

*(a)* This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof. Except with respect to matters for which no prior written notice is required by this Agreement, including but not limited to participation criteria, TD Waterhouse may modify or rescind existing provisions or add new provisions to this Agreement upon twenty-four (24) hours prior notice. Any such amendment will not affect rights or obligations either Advisor or TD Waterhouse may incur before the effective date of the amendment.

*(b)* The failure of either party at any time to require performance by the other party of any provisions of this Agreement will not affect in any way the right to require such performance at any time thereafter. The waiver by either party of a breach of any provisions hereof will not be taken or held to be a waiver of the provision itself.

*(c)* If any provision of this Agreement is deemed unenforceable, the remaining provisions shall remain in full force and effect.

## 16.  Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to its conflict of laws principles.

IN WITNESS WHEREOF, the parties have hereunto affixed their signatures as of the date and year first written above.
TD WATERHOUSE INVESTOR SERVICES, INC.

| | | |
|---|---|---|
| 4/10/2002 | | Ron Brock |
| Date | Advisor Signature | Print Name |
| 4/19/02 | | Jen Bertagnolli |
| Date | TD Waterhouse Investor Services, Inc. | Print Name |