# EXHIBIT 14

## STARK & STARK
A PROFESSIONAL CORPORATION

**BRIAN A. CARLIS, ESQUIRE**
bcarlis@stark-stark.com
Direct Dial Number
(609) 895-7313
Direct Fax Number
(609) 895-7395

January 19, 2017

**VIA ELECTRONIC MAIL AND FEDERAL EXPRESS**

Felicia M. Fox, Esquire
Senior Case Administrator
FINRA Dispute Resolution, Inc.
55 West Monroe Street, Suite 2600
Chicago, IL 60603-5104
Felicia.Fox@finra.org
midwestprocessingcenter@finra.org

Re: **Sheldon and Judith Ferkey Revocable Trust v. Sheaff Brock Investment Advisors,
LLC, Two Fish Management, LLC and TD Ameritrade Clearing, Inc.
FINRA-DR Arbitration No. 16-02506**

Dear Ms. Fox:

Enclosed please find an original and three (3) copies of Two Fish Management, LLC's Statement of Answer to TD Ameritrade Clearing, Inc.'s Third-Party Statement of Claim and Cross-Claim of Respondent Two Fish Management, LLC v. Sheaff Brock Investment Advisors, LLC. Also enclosed is our check in the amount of $1,700.00 for the Cross-Claim filing fee. Two Fish Management, LLC previously submitted its Uniform Submission Agreement.

By copy of this letter, I am serving same upon Michael H. Schaalman, Esquire, counsel to Claimant; Ronald P. Kane, Esquire, counsel to Sheaff Brock Investment Advisors, LLC; and Dana Sirkis Gloor, Esquire, counsel to TD Ameritrade Clearing, Inc.

Thank you for your attention to this matter. Please call me if you have any questions.

Sincerely,

STARK & STARK
A Professional Corporation

By: _____
BRIAN A. CARLIS

BAC/cz
Enclosures
cc: Michael H. Schaalman, Esquire (via electronic mail only – w/enclosures)
Ronald P. Kane, Esquire (via electronic mail only – w/enclosures)
Dana Sirkis Gloor, Esquire (via electronic mail only – w/enclosures)

EXHIBIT
14

SHELDON S. & JUDITH M. FERKEY
REVOCABLE TRUST,

    Claimant,

vs.                                     Arbitration No. 16-02506

TD AMERITRADE CLEARING, INC.,

    Respondent,

---

TD AMERITRADE CLEARING, INC.,

    Third-Party Claimant,

vs.

SHEAFF BROCK INVESTMENT ADVISORS,
LLC and TWO FISH MANAGEMENT, LLC

    Third-Party Respondents,

---

TWO FISH MANAGEMENT, LLC,

    Cross-Claimant,

vs.

SHEAFF BROCK INVESTMENT ADVISORS,

    Cross-Claim Respondent.

---

**TWO FISH MANAGEMENT, LLC'S STATEMENT OF ANSWER TO**
**TD AMERITRADE CLEARING, INC.'S THIRD-PARTY STATEMENT OF CLAIM**
**AND CROSS-CLAIM OF RESPONDENT TWO FISH MANAGEMENT, LLC v.**
**SHEAFF BROCK INVESTMENT ADVISORS, LLC**

4823-7908-7936, v. 1

Respondent, Two Fish Management, LLC ("Two Fish") by and through its undersigned counsel and pursuant to Rule 12303(a) of the FINRA Code of Arbitration Procedure, submits the following Statement of Answer and Cross-Claim in response to the Third-Party Statement of Claim filed on behalf of TD Ameritrade Clearing, Inc. ("Third-Party Claimant")[1] ("TD Ameritrade").

As set forth herein, Two Fish denies liability to TD Ameritrade for damages in any amount, under any theory.

## PRELIMINARY STATEMENT

Two Fish specifically denies that it is responsible to indemnify TD Ameritrade under the facts and circumstances of this matter. The Third-Party Statement of Claim confuses the agreement applicable to this situation, as well the relationships among the parties. To the extent necessary, Two Fish also specifically denies the allegations set forth in Claimant's Statement of Claim and Claimant's Amended Statement of Claim.

Third-Party Respondent Sheaff Brock Investment Advisors, LLC ("Sheaff Brock") was Claimant's investment advisor. Sheaff Brock hired Two Fish as a sub-advisor. Sheaff Brock presented the investment strategy to Claimant. Sheaff Brock was the provider of the strategy and Two Fish was hired as sub-advisor to implement and execute the strategy, subject to very broad parameters provided by Sheaff Brock. Two Fish was not the advisor to Claimant, or TD Ameritrade, but served as sub-advisor to Sheaff Brock.

The Advisor Master Account Application, including the Institutional Services Agreement, attached as Exhibit A to TD Ameritrade's Answer, Counterclaim and Cross-Claim applies to Sheaff Brock. The account at issue was opened pursuant to that agreement. Two Fish was not a party to that agreement.

---

[1] TD Ameritrade has styled its claim against Two Fish as a Cross-Claim. Since FINRA has advised that the original Statement of Claim filed by The Sheldon S. & Judith M. Ferkey Revocable Trust has been withdrawn, Two Fish characterizes the claims asserted by TD Ameritrade as Third-Party claims.

Two Fish entered into a separate agreement with TD Ameritrade, which served to govern the duties, rights and responsibilities of accounts introduced to TD Ameritrade, by Two Fish, for which Two Fish would provide investment management services. In the present matter, Two Fish was not acting as a client of TD Ameritrade. Sheaff Brock was a client of Two Fish.

## STATEMENT OF FACTS

Two Fish is simply not liable to TD Ameritrade for any damages, under any theory. In this regard, it is critical to understand the business model utilized by the parties. Third-Party Respondent Sheaff Brock was Claimant's investment advisor. Sheaff Brock hired Two Fish to serve as a sub-advisor, pursuant to a Sub-Advisory Agreement dated September 12, 2012, a true and correct copy of which is annexed hereto as "**Exhibit 1.**" This is common in the securities industry. As a function of this business model, managing investment advisors do not want the sub-advisors communicating directly with their clients. Accordingly, the sub-advisor typically has no knowledge of the customer's personal financial situation, risk tolerance, investment time horizon, etc. All of this is the responsibility of the managing investment advisor. There is nothing even remotely inappropriate about this business model. In fact, the investment Management Agreement between Sheaff Brock and Claimant indicates that the services of a sub-investment advisor may be retained without the client's prior consent or notification. See, Management Agreement between Sheaff Brock and Claimant, annexed hereto as "**Exhibit 2.**" To put it simply, Sheaff Brock could have retained Two Fish without even telling the Claimant. To make this point clear, no agreement between the client (in this case Claimant herein) and the sub-advisor (Two Fish) exists. The Claimant was not a client of Two Fish. Sheaff Brock was a client of Two Fish.

It is also important to point out that Sheaff Brock alone was responsible for the suitability determination. Sheaff Brock was likewise responsible for any and all risk disclosures. Sub-advisors

4823-7908-7936, v. 1

typically do not make any representations whatsoever to the managing investment advisor's client. That is true of the situation in the present case. Two Fish made no representations of any nature to Claimant herein and certainly did not make any misrepresentations.

Two Fish is not liable to TD Ameritrade for indemnification under any agreement, under the facts and circumstances of this case. Two Fish is not a party to either the Advisor Master Account Application or the Advisor Direct Agreement that are attached as Exhibits A and B to TD Ameritrade's Answer.

## CONCLUSION

In conclusion, Two Fish is simply not liable to TD Ameritrade. The account at issue was opened pursuant to an agreement between TD Ameritrade and Sheaff Brock. Two Fish is not a party to that agreement.

WHEREFORE, Two Fish demands judgment dismissing the Third-Party Statement of Claim, with prejudice, together with an award of all reasonable costs and expenses, including reasonable attorneys' fees, costs of suit and such further relief as the panel deems just and proper.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Third-Party Statement of Claim fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Two Fish discharged its responsibilities in a professional and ethical manner and all of its actions were well within the parameters of exchange and governmental regulations.

### THIRD AFFIRMATIVE DEFENSE

All allegations as to Two Fish set forth in the Statement of Claim, Amended Statement of Claim and Third-Party Statement of Claim are specifically denied.

- 4 -

## FOURTH AFFIRMATIVE DEFENSE

This claim is also barred by any applicable affirmative defenses as a matter of law or equity.

## CROSS-CLAIM

Without admitting the truth of any allegations advanced by TD Ameritrade in the Third-Party Statement of Claim, without waiving any defenses to the allegations made by TD Ameritrade in the Third-Party Statement of Claim and without waiving other causes of action available to Two Fish, Two Fish asserts the below causes of action against Cross-Respondent Sheaff Brock Investment Advisors, LLC ("Sheaff Brock" or "Cross-Respondent").

Two Fish restates, re-alleges and incorporates herein by reference the allegations set forth in its Statement of Answer as if fully set forth in this cross-claim.

Two Fish made no representations of any nature and certainly did not make any misrepresentations. Two Fish was not responsible for determining the suitability of the portfolio strategy for Claimant. Two Fish was not responsible for advising Claimant of risk.

### Sheaff Brock is Contractually Obligated to Defend and Indemnify Two Fish

Section 10 of the Sub-Advisory Agreement (Exhibit 1) addresses the issue of indemnification. Indemnification provisions are common in sub-advisory agreements. Indemnification provisions are common for the very reasons presented here. The present matter is clearly a "third-party claim resulting from actions or omissions of managing advisor, as contemplated by the indemnification provision." Two Fish fulfilled its obligations under the Sub-Advisory Agreement.

By reason of the foregoing and in the event that any liability is found against Two Fish, whether by judgment or settlement, Two Fish shall be entitled to judgment against Cross-Respondent Sheaff Brock in like amounts, together with such additional sum or sums as may be proven at time of the arbitration for the reasonable costs incurred by Two Fish in defending TD Ameritrade's allegations and

- 5 -

in prosecuting this cross-claim, including reasonable attorney's fees.

Two Fish, therefore, is entitled to be held harmless and indemnified by Sheaff Brock in the same amount as may be paid or rendered against Two Fish on TD Ameritrade's Third-Party Statement of Claim, by virtue of settlement or judgment, according to the fault of Sheaff Brock, which proximately caused and/or contributed to the injury or damages, if any, suffered by TD Ameritrade. Two Fish is further entitled to be held harmless and indemnified by Sheaff Brock for the reasonable costs incurred by Two Fish in defending TD Ameritrade's Third-Party Statement of Claim and in prosecuting this Cross-Claim, including reasonable attorney's fees.

WHEREFORE, Two Fish seeks judgment against Sheaff Brock as follows:

1.  For indemnification from Sheaff Brock for all judgment amounts, settlement amounts, costs of defense, costs of prosecution, and attorney's fees incurred by Respondent Two Fish;

2.  For contribution from Sheaff Brock for all judgment amounts, settlement amounts, costs of defense, costs of prosecution, and attorney's fees incurred by Respondent Two Fish;

3.  For reasonable attorney's fees pursuant to law and/or contract;

4.  For costs of suit incurred herein, specifically including FINRA Member Surcharges and Fees;

5.  For such other and further relief as the Arbitration Panel deems just and proper.

Respectfully submitted,

**STARK & STARK, P.C.**
*Attorneys for Third-Party Respondent/*
*Cross-Claimant Two Fish Management, LLC*

By: _____
BRIAN G. CARLIS, ESQUIRE
**Stark & Stark, P.C.**
993 Lenox Drive
Lawrenceville, New Jersey 08648
Telephone: (609) 896-9060
Fax: (609) 895-7395
bcarlis@stark-stark.com

Dated: January 19, 2017

- 7 -

EXHIBIT 1

## Sheaff Brock Investment Advisors, LLC

## SUB-ADVISORY AGREEMENT

THIS SUB-ADVISORY AGREEMENT ("Agreement") is made and entered into as of this __12__ day of ___September___, __2017__ by and between Sheaff Brock Investment Advisors, LLC (hereinafter referred to as the "Managing Advisor"), and Two Fish Management Inc., an investment advisor registered with the US Securities and Exchange Commission (hereinafter referred to as the "Sub-Advisor").

### R E C I T A L S

WHEREAS, Managing Advisor is an investment advisor registered with the US Securities and Exchange Commission and, in that capacity, provides investment advisory services to clients (each, a "Client") who have entered into an investment advisory agreement (each, a "Client Agreement");

WHEREAS, Clients have agreed that Managing Advisor may engage other SEC or state registered investment advisors to manage some or all of Clients' funds;

WHEREAS, Managing Advisor desires to retain Sub-Advisor to provide investment advisory services, in connection with the management of some of the Managing Advisor Client accounts, as are designated from time to time by Managing Advisor, and Sub-Advisor is willing to render such investment advisory services; and

NOW, THEREFORE, the parties hereto agree as follows:

### Section 1. Designation as Sub-Advisor/Investment Manager.

Managing Advisor hereby designates Sub-Advisor as a non-exclusive investment manager with respect to each of the Client accounts as Managing Advisor may designate in writing from time to time in its sole discretion (each, a "Client Account"). Subject to the terms of this Agreement, Sub-Advisor hereby agrees to act as an investment manager with respect to the Client Accounts on a discretionary basis, unless otherwise indicated by Managing Advisor. Nothing contained herein shall prevent Managing Advisor from entering into investment management agreements or sub-investment management agreements with any other party for some or all of any Client's assets under management.

### Section 2. Acceptance of Designation; Non-Solicitation.

Upon Sub-Advisor accepting in writing its designation as an investment manager to a particular Client Account (which Sub-Advisor may refuse to do for any reason), Sub-Advisor agrees to use its best professional judgment to make investment decisions for each Client Account in accordance with Sub-Advisor's customary investment management policies and obligations. Upon receipt from Managing Advisor of the applicable provisions of each Client's Client Agreement, Sub-Advisor will use best efforts to perform consistently with those provisions. Sub-Advisor understands that its designation as investment manager with respect to the Client Accounts may be revoked in writing by Managing Advisor at any time. During the term of this Agreement and for a period of two (2) years thereafter, each of Managing Advisor and Sub-Advisor agrees that it will not intentionally or knowingly solicit a client of the other to become a client, except that the performance of the services imposed on Sub-Advisor pursuant to this Agreement and the Client Agreements, if any, shall not constitute solicitation activities (the "Non-Solicitation Clause").

BF/FINRA

1

**Section 3. Duties of Sub-Advisor.**

Subject to the terms of this Agreement, Sub-Advisor will manage Client Accounts in accordance with its investment management philosophy and policies and pursuant to any written instructions from Managing Advisor and subject to the following:

A. Sub-Advisor will use reasonable efforts to act in conformity with Client Agreements if and when delivered by Managing Advisor to Sub-Advisor, and with the written instructions and directions of Managing Advisor, and will conform to and comply with the requirements of the Investment Advisers Act of 1940 and rules thereunder (the "Advisers Act") and all other applicable federal and state laws and regulations, as each is amended from time to time.

B. Sub-Advisor will maintain all licenses, permits, and registrations and make all filings that are required under federal and state laws in connection with the performance of its duties hereunder.

C. Sub-Advisor will provide Managing Advisor with adequate copies of Sub-Advisor's Form ADV and other disclosure materials that may be necessary or appropriate for provision to Clients and consult with Managing Advisor regarding any materials prepared to be sent or distributed to a Client. Sub-Advisor represents to Managing Advisor that such materials are true and correct in all material respects and will not intentionally omit anything necessary to make the statements made therein materially true and correct.

D. Sub-Advisor will make appropriate persons available for the purpose of reviewing with representatives of Managing Advisor on a regular basis at reasonable times the management of each Client's Account. Sub-Advisor or its designee will provide to Managing Advisor on request information relating to all transactions concerning the assets in the Clients' Accounts which are being managed by Sub-Advisor.

E. Sub-Advisor will manage each Client's Account in light of Client's particular objectives, investment restrictions and other information set forth in Client's investment policy or other request that solicited information concerning Client's financial situation, investment objectives and risk tolerance when Client opened its account with Managing Advisor", provided that such information has been provided to Sub-Advisor. In addition, Sub-Advisor will be reasonably available to Client and Managing Advisor for joint consultation regarding the management of Client's Account and the individual Client's financial situation and investment needs, if requested by Client and Managing Advisor.t Managing Advisor acknowledges that communication with and reporting to Clients shall be the primary responsibility of Managing Advisor.

F. In accordance with each Client's investment objectives, instructions and any other information set forth, Sub-Advisor will provide supervision of the investments for each Client's Account, and will determine from time to time what securities, certificates, investments or other products (collectively, the "Investments"), will be purchased, retained or sold with respect to each Client's Account and what portion of Client's Account will be invested in the Investments or held uninvested in cash.

G. Sub-Advisor will not have authority and discretion to select brokers and dealers to execute transactions initiated by Sub-Advisor, but will engage such brokers as Managing Advisor shall direct. Accordingly, unless Sub-Advisor (or an affiliate) acts as broker-dealer for Clients, Managing Advisor and not Sub-Advisor, will be responsible for "best execution" obligations as they relate to the selection of executing brokers for Client transactions as contemplated under the Advisers Act.

H. Sub-Advisor will promptly notify Managing Advisor of any financial condition that is likely to impair Sub-Advisor's ability to fulfill its commitment under this Agreement.

2

I.    Services to be furnished by Sub-Advisor under this Agreement may be furnished through the medium of any of Sub-Advisor's partners, officers or employees.

## Section 4. Duties of Managing Advisor.

A.    Managing Advisor will act as the principal investment advisor for Clients and will continue to have responsibility for all services, communication and reporting to be provided to Clients pursuant to the Advisors Act and the Client Agreement or otherwise and will oversee and review Sub-Advisor's performance of its duties under this Agreement; provided, however, that nothing herein will be construed to relieve Sub-Advisor of responsibility for compliance with the investment objectives, policies and restrictions as provided in Sections 2 and 3 hereunder. Managing Advisor shall comply with, and shall be designated as principal sponsor under, Rule 3a-4 of the 1940 Act.

B.    Managing Advisor will determine through Client communications and notifications whether there have been any changes in Client's financial situation or investment objectives, and whether Client wishes to impose any reasonable restrictions on the management of Client's Account or reasonably modify existing restrictions and will promptly notify Sub-Advisor of any changes applicable to the management of a client account.

C.    Managing Advisor will maintain, keep current and preserve on behalf of Client Accounts, all records required by the Advisors Act.

D.    Managing Advisor will arrange for Sub-Advisor to receive duplicate confirmations and statements or an electronic download of transaction history from the custodian, clearing firm or broker-dealer selected by Managing Advisor (unless Sub-Advisor (or an affiliate) is the broker-dealer). Managing Advisor shall provide such information about Clients as Sub-Advisor reasonably requests in order to meet any and all legal requirements applicable to Sub-Advisor in connection with the performance of its duties hereunder, relating to the financial condition of the Client, including without limitation information relating to desired asset allocation, net worth, income, investment experience, risk tolerance, and investment objectives; provided that it shall be the responsibility of Managing Advisor to verify Client suitability and the foregoing information and to complete the foregoing analysis and to comply with anti-money laundering (and similar) legislation. Managing Advisor shall provide Sub-Advisor with copies of the Client's Client Agreement, trading authorization and such other Client/Managing Advisor account agreements as Sub-Advisor shall reasonably request to verify that Sub-Advisor and Managing Advisor are authorized by Client to render the investment advisory services to Client on a discretionary basis as contemplated by this Agreement and to verify that Client has acknowledged the existence of possible sub-management relationships such as that contemplated by this Agreement and the sharing of Client information with Sub-Advisor as contemplated by this Agreement. Managing Advisor shall provide access to Sub-Advisor to execute trades on behalf of Clients in Client Accounts held at the custodian.

E.    Managing Advisor, when required, shall deliver to each Client a copy of Sub-Advisor's Privacy Policy, Form ADV, Form ADV Part 2, and, if requested by Sub-Advisor, shall make each Client aware of the existence, and a general summary of the material terms, of this Agreement by arranging for Client to execute and deliver to Sub-Advisor an acknowledgment in a form reasonably acceptable to Sub-Advisor.

## Section 5. Transactions Procedures.

Client Accounts will be maintained by a custodian selected by Managing Advisor, or by an independent custodian selected by the Client (the "**Custodian**"). All transactions will be consummated by payment to or delivery by Custodian of all cash and/or Investments due to or from Client Accounts or by on-line access. Neither Sub-Advisor nor Managing Advisor will have possession or custody thereof or any responsibility or liability for such custody.

**Section 6. Section 13(f) Compliance.**

If applicable, Sub-Advisor and Managing Advisor agree that Sub-Advisor will exercise "investment discretion" with respect to Client Accounts within the meaning of Section 13(f) of the Securities Exchange Act of 1934, and that Sub-Advisor will be responsible for filing any required reports with the SEC pursuant to such section and rules thereunder, copies of which shall be promptly delivered to Managing Advisor.

**Section 7. Compensation to Sub-Advisor.**

A. Sub-Advisor understands that Clients will compensate the Managing Advisor for the services to be rendered to them pursuant to this agreement. Sub-Advisor understands that the Managing Advisor generally calculates and bills or debits fees to Clients [in advance, on a quarterly basis], with respect to the services. As compensation for Sub-Advisor's services to be rendered hereunder, Client shall pay and shall allow each custodian to deduct and pay to the Managing Advisor from each Client account, the advisory fee. This Sub-Advisory Fee shall be based on the market value of the assets held in each account on the last business day of the quarter in which the securities markets are open, and shall be calculated at 0.35% per annum for assets under advisement.

B. Client may terminate the Investment Advisory Agreement without penalty by notifying Sub-Advisor via Managing Advisor. If Client terminates an account before the end of a calendar quarter that has already been paid, Client will receive a pro-rata refund for any prepaid, unused fees. Subsequently, this Agreement may be terminated at any time by either party (if Sub-Advisor informs Client or Client informs Sub-Advisor via Managing Advisor) subject to Section 18 hereunder.

**Section 8. Limitation of Liability.**

A. Managing Advisor will not be liable to Sub-Advisor for any error of judgment or for any loss suffered by Sub-Advisor in connection with the performance of its obligations under this Agreement, except a loss resulting from breach of this Agreement, or a loss resulting from willful misfeasance, bad faith or gross negligence on Managing Advisor's part in the performance of its duties or from reckless disregard of its obligations and duties under this Agreement, except as may otherwise be provided under provisions of applicable state law which cannot be waived or modified hereby.

B. Sub-Advisor will not be liable to Managing Advisor for any error of judgment or for any loss suffered by Managing Advisor in connection with the performance of its obligations under this Agreement, except a loss resulting from breach of this Agreement, or a loss resulting from willful misfeasance, bad faith or gross negligence on Sub-Advisor's part in the performance of its duties or from reckless disregard of its obligations and duties under this Agreement, except as may otherwise be provided under provisions of applicable state law which cannot be waived or modified hereby.

**Section 9. Other Investment Activities of Sub-Advisor.**

It is understood that Sub-Advisor or one or more of its affiliates has investment responsibilities, renders investment advice to and performs other investment advisory services for other individuals or entities ("Other Accounts"), and that Sub-Advisor, its affiliates or any of its or their directors, officers, agents or employees may buy, sell or trade in any securities for their respective accounts ("Affiliated Accounts"). Subject to the provisions of Sections 2 and 3 hereof, Managing Advisor, on behalf of Client Accounts, agrees that Sub-Advisor or its affiliates may give advice or exercise management responsibility and take such other action for Other Accounts and Affiliated Accounts which may differ from the advice given or the time or nature of action taken for Client Accounts, provided that Sub-Advisor acts in good faith, and provided

further that it is Sub-Advisor's policy to allocate, within its reasonable discretion, investment opportunities to Client Accounts over a period of time on a fair and equitable basis relative to the Other Accounts and the Affiliated Accounts, taking into account the cash position and the investment objectives and policies of each Client's Account and any specific restrictions that may be applicable. Subject to the provisions of Sections 2 and 13, nothing herein shall prevent Sub-Advisor from entering into investment management agreements or sub-investment management agreements with other parties.

### Section 10. Indemnification.

A. Sub-Advisor agrees to release, covenant not to sue, indemnify and hold harmless Managing Advisor and each person, if any, who controls Managing Advisor, its members, managers, employees, affiliates and agents against any and all loss, liability, claim, damage and expense, including but not limited to attorneys' fees, as incurred, arising out of or based upon the breach of any provision of this Agreement by Sub-Advisor, the inaccuracy of any of the representations made by Sub-Advisor under this Agreement, any material inaccurate or incomplete statement contained in Sub-Advisor's Form ADV and/or brochure, any failure on the part of Sub-Advisor to carry out its duties under this Agreement, any third party claim resulting from actions or omissions of Sub-Advisor or its members, employees, affiliates or agents, and any termination of this Agreement by Managing Advisor permitted by the terms of this Agreement.

B. Managing Advisor will give prompt notice to Sub-Advisor of any action commenced against it in respect of which indemnity may be sought hereunder.

C. Managing Advisor agrees to release, covenant not to sue, indemnify and hold harmless Sub-Advisor and each person, if any, who controls Sub-Advisor, its shareholders, directors, employees, affiliates and agents against any and all loss, liability, claim, damage and expense, including but not limited to attorneys' fees, as incurred, arising out of or based upon the breach of any provision of this Agreement by Managing Advisor, the inaccuracy of any of the representations made by Managing Advisor under this Agreement, any material inaccurate or incomplete statement contained in Managing Advisor's Form ADV and/or brochure, any failure on the part of Managing Advisor to carry out its duties under this Agreement, including, without limitation, the failure by Managing Advisor to provide to Sub-Advisor information, guidance or direction received by it from Client as required under this Agreement, any third party claim resulting from actions or omissions of Managing Advisor or its shareholders, employees, affiliates, directors or agents, including in connection with engaging or rendering services to Clients, and any termination of this Agreement by Sub-Advisor permitted by the terms of this Agreement.

D. Sub-Advisor will give prompt notice to Managing Advisor of any action commenced against it in respect of which indemnity may be sought hereunder.

### Section 11. Confidentiality.

Subject to the duty of Sub-Advisor and Managing Advisor to comply with the applicable law, including any demand of any regulatory or taxing authority having jurisdiction, the parties hereto will treat as confidential all information pertaining to Client Accounts and the actions of Sub-Advisor in respect thereof. If Managing Advisor prepares standard written materials for public distribution that describes its services or programs and mentions Sub-Advisor, Managing Advisor will provide Sub-Advisor with copies of such materials for Sub-Advisor's approval (which shall not be unreasonably withheld) prior to their use. Managing Advisor agrees that it will not, without Sub-Advisor's prior consent, give any information or make any representations concerning Sub-Advisor or in connection with the sale of Sub-Advisor's investment advisory services, other than those contained in any written, audio or audio-visual materials prepared or approved by Sub-Advisor for use in connection with the sale of services.

### Section 12. Non-Solicitation.

5

In addition to the Non-Solicitation Clause contained above in Section 2 hereof, Sub-Advisor agrees that it will not, during the term of this Agreement and for a period of two years thereafter, hire, employ or contract with any former employee or independent contractor, including without limitation, those providing support, investment management or client solicitation services on behalf of Managing Advisor for a period of one year after the employee ceases their employment or the independent contractor's agreement has been canceled or been terminated with Managing Advisor. In addition to the Non-Solicitation Clause contained above in Section 2 hereof, Managing Advisor agrees that it will not, during the term of this Agreement and for a period of two years thereafter, hire, employ or contract with any former employee or independent contractor, including without limitation, those providing support, investment management or client solicitation services on behalf of Sub-Advisor for a period of one year after the employee ceases their employment or the independent contractor's agreement has been canceled or been terminated with Sub-Advisor.

### Section 13. Protection of Proprietary Interests.

Sub-Advisor and Managing Advisor each recognize and acknowledge that each party has made substantial effort and investment in developing its business and client relationships; that as a result of this contract each party will be in a position to obtain valuable information about the character of the other's business and its requirements for products and services, and that it is a legitimate business interest of each party to protect said investment and the confidentiality of information pertaining to its business; and that each party is being adequately compensated for its services through the provisions of the Agreement. Sub-Advisor and Managing Advisor also recognize and acknowledge that access to such information may enable Sub-Advisor or Managing Advisor to gain an unfair advantage over the other should such party subsequently engage in a competing business and utilize such information, which would result in substantial damage to Managing Advisor or Sub-Advisor, thereby requiring and justifying the conditions and covenants set forth herein.

A.  Sub-Advisor and Managing Advisor each agree that they will hold all Confidential Information (as defined below) in a fiduciary capacity and will not at any time (whether during or after the term of this Agreement):

  (i)     Disclose, directly or indirectly, in any manner to any person, corporation, or business entity, any Confidential Information, without the prior written consent of the party who deems such information as Confidential Information, or

  (ii)    (ii) Utilize any such Confidential Information for the gain, advantage or profit of anyone other than as intended by this Agreement.

B   Sub-Advisor and Managing Advisor further agree to exercise the highest degree of care in safeguarding the Confidential Information against loss, theft or other inadvertent disclosure and agree to generally take all steps necessary to maintain the confidentiality thereof. Nothing herein shall be construed as prohibiting Managing Advisor or Sub-Advisor from pursuing any other remedies available to them for such breach or threatened breach, including recovery of damages from the breaching party.

C.  All documents, records, computer software, computer data, notes, notebooks, memoranda and similar repositories of Confidential Information made or compiled by Sub-Advisor or Managing Advisor at any time, or made available to the other party, including any and all copies thereof, shall be deemed the exclusive property of the party originating the information, regardless of who actually acquired, prepared or assembled such records, books, files or data. All such documents, records, computer software, computer data, notes, notebooks, work papers, records or notes, or other records containing names and addresses of Clients served by Managing Advisor, including any and all copies thereof, shall, at the request of Managing Advisor, be delivered to Managing Advisor by Sub-Advisor promptly following the termination of this Agreement, unless Sub-Advisor is required to retain such by applicable law or order.

D.  "Confidential Information", as used herein, means any and all information disclosed to Sub-Advisor or Managing Advisor as a consequence of or through the relationship contemplated by this Agreement, not generally known to the relevant trade or industry, about the Clients of Managing Advisor and any and all information concerning Sub-Advisor's or Managing Advisor's methods of conducting or obtaining business; the products, processes and services used, developed, investigated or considered by Managing Advisor or Sub-Advisor; and information regarding Sub-Advisor's or Managing Advisor's finances, legal affairs, financial history or projections.

**Section 14. Representations of Managing Advisor.**

    A.  Managing Advisor represents that it is registered as an investment advisor under the Advisers Act and applicable state laws, and is not prohibited by such Act, laws or the rules thereunder from acting as contemplated by this Agreement.

    B.  In the performance of its duties and obligations under this Agreement, Managing Advisor represents that it will act in conformity with Client Agreements and any Client instructions, and will conform to and comply with the requirements of the Advisors Act, Rule 3a-4 under the 1940 Act, the Code, and all other applicable federal and state laws and regulations, as each is amended from time to time.

    C.  Managing Advisor will promptly advise Sub-Advisor of any event or occurrence, which would render Managing Advisor's disclosure document describing its services materially inaccurate.

    D.  Managing Advisor has the financial resources, personnel, properties and assets adequate for the performance of its obligations under this Agreement and will notify Sub-Advisor promptly of any developments in its financial situation, which materially adversely impact its ability to perform its obligations hereunder for Client Accounts.

    E.  This Agreement has been duly authorized, executed and delivered by Managing Advisor, and neither the execution nor delivery of this Agreement nor the performance by Managing Advisor of its obligations hereunder will conflict with, or result in a breach of, any other terms or provisions of, or constitute, with or without giving notice or lapse of time or both, a default under, any agreement or instrument to which it is a party or by which it is bound, or any law, order, rule, or regulation applicable to it of any jurisdiction, court, federal or state regulatory body, administrative agency or other governmental body, stock exchange or securities association having jurisdiction over it or its property or operations.

    F.  Managing Advisor represents that it will be qualified under the applicable securities laws of the states and other jurisdictions of the United States to act as an investment advisor to all Client Accounts whose appointment Sub-Advisor accepts pursuant to this Agreement, and will maintain such qualifications for the duration of this Agreement. Managing Advisor will promptly notify Sub-Advisor of any change in such status.

    G.  Except to the extent disclosed to Sub-Advisor, there is no action, suit or proceeding before any court or governmental agency or body, domestic or foreign, now pending or, to the knowledge of Managing Advisor, threatened against or affecting Managing Advisor which might result in any material adverse change in the condition, financial or otherwise, business or prospects of Managing Advisor, or might materially and adversely affect its properties or assets. Managing Advisor agrees to use commercially reasonable efforts to inform Sub-Advisor of any proceeding that would be disclosable under this provision as soon as reasonably practicable and consistent with any negotiations or discussions with any such court or governmental agency or body relating to such proceeding.

    H.  Managing Advisor, its officers and directors have not been the subject at any time to an order of the SEC under Section 203(f) of the Advisors Act.

    I.  Managing Advisor, its officers and directors have not been convicted within the past ten (10) years of any felony or misdemeanor involving conduct described in Section 203(e)(2)(A) through (D) of the Advisors Act.

J. Managing Advisor, its officers and directors have not been found at any time by the SEC to have engaged, or been convicted at any time of engaging, in any of the conduct specified in paragraphs (1), (4) or (5) of Section 203(e) of the Advisors Act.

K. Managing Advisor, its officers and directors have not been subject to an order, judgment or decree described in Section 203(e)(3) of the Advisors Act.

## Section 15. Representations of Sub-Advisor.

A. Sub-Advisor represents that it is registered as an investment advisor under the Advisers Act and applicable state laws, and is not prohibited by such Act, laws or the rules thereunder from acting as contemplated by this Agreement.

B. In the performance of its duties and obligations under this Agreement, Sub-Advisor represents that it will act in conformity with the Client Agreements and any written Client instructions delivered to it, and will conform to and comply with the requirements of the Advisers Act, Rule 3a-4 under the 1940 Act, and all other applicable federal and state laws and regulations, as each is amended from time to time.

C. Sub-Advisor understands that Client Accounts may be owned by investors who are residents in various states of the United States and that under such circumstances its performance of its obligations hereunder may be subject to the securities and other applicable laws of the various states. Sub-Advisor represents that it will be qualified under the applicable securities laws of the states and other jurisdictions of the United States to act as an investment advisor to all Client Accounts whose appointment it accepts pursuant to this Agreement, and will maintain such qualifications for the duration of this Agreement. Sub-Advisor will promptly notify Managing Advisor of any change in such status.

D. The information provided by Sub-Advisor for use in any disclosure document describing the services provided hereunder are true and correct as of the date hereof, and Sub-Advisor acknowledges and consents to the reliance by Managing Advisor and Clients on the truth and accuracy of such information. All other information regarding Sub-Advisor provided directly or indirectly to Managing Advisor in connection with the services rendered on behalf of Client Accounts is or will be true and correct as of the dates furnished.

E. Sub-Advisor will promptly advise Managing Advisor of any event or occurrence that would render Sub- Advisor's ADV materially inaccurate.

F. Sub-Advisor has the financial resources, personnel, properties and assets adequate for the performance of its obligations under this Agreement and will notify Managing Advisor promptly of any developments in its financial situation, which materially adversely impact its ability to perform its obligations hereunder for Client Accounts.

G. Except to the extent disclosed to Managing Advisor, there is no action, suit or proceeding before any court or governmental agency or body, domestic or foreign, now pending or, to the knowledge of Sub-Advisor, threatened against or affecting Sub-Advisor which might result in any material adverse change in the condition, financial or otherwise, business or prospects of Sub-Advisor, or might materially and adversely affect its properties or assets. Sub-Advisor agrees to use commercially reasonable efforts to inform Managing Advisor of any proceeding that would be disclosable under this provision as soon as reasonably practicable and consistent with any negotiations or discussions with any such court or governmental agency or body relating to such proceeding.

H. This Agreement has been duly authorized, executed and delivered by Sub-Advisor, and neither the execution nor delivery of this Agreement nor the performance by Sub-Advisor of its obligations hereunder will conflict with, or

8

result in a breach of, any other terms or provisions of, or constitute, with or without giving notice or lapse of time or both, a default under, any agreement or instrument to which it is a party or by which it is bound, or any law, order, rule, or regulation applicable to it of any jurisdiction, court, federal or state regulatory body, administrative agency or other governmental body, stock exchange or securities association having jurisdiction over it or its property or operations.

I.  Sub-Advisor, its officers and directors have not been the subject at any time to an order of the SEC under Section 203(f) of the Advisors Act.

J.  Sub-Advisor, its officers and directors have not been convicted within the past ten (10) years of any felony or misdemeanor involving conduct described in Section 203(e)(2)(A) through (D) of the Advisors Act.

K.  Sub-Advisor, its officers and directors have has not been found at any time by the SEC to have engaged, or been convicted at any time of engaging, in any of the conduct specified in paragraphs (1), (4) or (5) of Section 203(e) of the Advisors Act.

L.  Sub-Advisor, its officers and directors have not been subject to an order, judgment or decree described in Section 203(e)(3) of the Advisors Act.

## Section 16. Amendment.

This Agreement may be amended at any time, but only by written agreement between Managing Advisor and Sub-Advisor.

## Section 17. Effective Date.

The Agreement will become effective on the date set forth on the first page of this Agreement.

## Section 18. Termination.

This Agreement may be terminated by Managing Advisor, without a penalty, upon not less than thirty (30) days written notice to Sub-Advisor. The Agreement may be terminated by Sub-Advisor, without a penalty, upon not less than thirty (30) days written notice to Managing Advisor. In addition to the foregoing, either party may terminate this Agreement if the other party or any of its affiliates files a petition (or has a petition filed against it) for bankruptcy, seeks to have a receiver appointed, is or becomes insolvent, or otherwise ceases to do business or seeks to liquidate its business. In addition to the foregoing, this Agreement may be terminated at any time with respect to a specific Client Account or Client Accounts upon written notice by either party to the other and termination will become effective with respect to such Account or Accounts upon receipt of such notice; provided, however, that such termination will not affect any Client Account for which no termination has occurred or liabilities or obligations of the parties incurred, or arising from transactions initiated, under this Agreement prior to termination. In the event of a breach of any provision hereof by a party, this Agreement may be terminated immediately upon written notice to the other party. Any termination of this Agreement will not affect the status, obligations or liabilities of any party hereto to the other party which either arose prior to termination or which by its nature or the terms hereof, survive termination.

## Section 19. Governing Law.

This Agreement will be governed by the internal laws of the State of Indiana without regard to conflict of law principles, provided, however, that nothing herein shall be construed as inconsistent with the Advisors Act.

## Section 20. Severability/Successors.

9

Should any part of this Agreement be held invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement will not be affected thereby. This Agreement shall be binding upon and will inure to the benefit of the parties hereto and their respective successors.

### Section 21. Notice.

Any notice, advice or report to be given pursuant to this Agreement will be deemed sufficient if delivered or mailed by registered, certified or overnight mail, postage prepaid addressed by the party giving notice to the other party at the last address furnished by the other party.

### Section 22. Arbitration.

A. Sub-Advisor and Managing Advisor understand and agree that, to the extent permitted by law, all claims arising out of this Agreement (a "Dispute") will be resolved through final and binding arbitration pursuant to the terms hereof. No provision of, nor the exercise of any rights under this arbitration clause shall limit the right of any party to obtain provisional or ancillary remedies such as injunctive relief from a court having jurisdiction. The institution and maintenance of an action as described above shall not constitute a waiver of the right of any party, including the plaintiff, to submit the Dispute to arbitration, nor render inapplicable the compulsory arbitration provisions hereof. Sub-Advisor and Managing Advisor each acknowledge and agree that: (i) such arbitration will be final and binding on the parties; (ii) the parties are hereby waiving their rights to seek remedies in court, including the right to a jury trial; (iii) pre-arbitration discovery is generally more limited than and different from discovery conducted in connection with litigation; (iv) the arbitrator's award is not required to include factual findings or legal reasoning; and (v) a party's right to appeal or seek modification of rulings by the arbitrator will be strictly limited.

B. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Indianapolis, Indiana, before FINRA, in accordance with the FINRA Code of Arbitration Procedure. The arbitration shall be administered by FINRA pursuant to its arbitration rules and procedures then in effect, before a panel of industry arbitrators. Judgment on the award may be entered in any court having jurisdiction.

C. This arbitration provision shall be enforced and interpreted exclusively in accordance with applicable Federal law, including the Federal Arbitration Act. Any costs, fees, or taxes involved in enforcing the award shall be fully assessed against and paid by the party resisting enforcement of said award. The prevailing party shall also be entitled to an award of reasonable attorneys' fees and costs incurred in connection with the enforcement of this Agreement.

### Section 23. Entire Agreement.

This Agreement embodies the entire agreement and understanding between the parties hereto, and supersedes all prior agreements and understandings relating to this Agreement's subject matter. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original, but such counterparts will, together, constitute only one instrument.

Where the effect of a requirement of the Advisors Act reflected in any provision of this Agreement is altered by a rule, regulation or order of the SEC, whether of special or general application, such provision will be deemed to incorporate the effect of such rule, regulation or order.

### Section 24. Relationship of Parties.

Sub-Advisor shall for all purposes herein be deemed to be an independent contractor of Managing Advisor. It is expressly agreed to by the parties hereto that the relationship created by this Agreement does not create a partnership or joint venture between Sub-Advisor and Managing Advisor. Except as specifically set forth herein with respect to Sub-Advisor's authority to make trading decisions and give orders to broker-dealers for trading the Client's Accounts, neither party shall have any authority to bind the other nor shall either party represent to third parties that it has such authority.

### Section 25. Assignment.

Neither party, without written consent of the other, may assign any of the rights or obligations hereunder.

### Section 26. Survival.

The provisions of the Non-Solicitation Clause in Section 2, Section 8 (Limitation of Liability), Section 10 (Indemnification), Section 11 (Confidentiality), Section 12 (Non-Solicitation), Section 13 (Protection of Proprietary Interests), Section 18 (Termination), Section 19 (Governing Law), and Section 22 (ARBITRATION) shall survive the termination or expiration of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their officers designated below as of the day and year first written above.

**Sheaff Brock Investment Advisors, LLC**

Signature: _____

Name: RON BROCK

Title: MANAGING DIRECTOR

Dated: September 7, 2012

**Two Fish Management, LLC**

Signature: _____

Name: JB SAUDER

Title: MANAGER

Dated: September 12, 2012

11

EXHIBIT 2



# Management Agreement

Updated 11/1/2015



**Sheaff Brock**
Investment Advisors, LLC

10401 North Meridian St., Suite 100
Indianapolis, IN 46290

# MANAGEMENT AGREEMENT

Sheaff Brock Investment Advisors, LLC ("Adviser") and the undersigned ("Client") hereby agree as of the date set forth below the Adviser shall act as investment adviser, for Client's investment portfolio, and for any additions which may be made to this account(s); with the following terms and conditions:

## INVESTMENT AUTHORITY

Adviser will act as investment adviser for the Account, supervise and direct the investments, and make all investment decisions within the scope of the strategy for the account. With the exception of the Option Overlay accounts where underlying collateral positions will only be sold at the request of the client, in other managed accounts Adviser may direct the sale, purchase or trade of any assets as it may deem appropriate, and the reinvestment, or holding for reinvestment, of any proceeds of such sales or trades, as it may deem advisable. Additionally, Adviser may retain the services of a sub-investment adviser for the Account without Client's prior consent or notification and if so retained, the sub investment adviser will make all investment decisions for the Account or for the portion of the account for which it was retained by Adviser. *Adviser may act without Client's prior consent or prior notification and may issue instructions to brokers, dealers, or custodians.*

## INVESTMENT OBJECTIVES

Adviser shall use its best efforts in the implementation of the investment strategy. Adviser takes no responsibility for assets Client instructs to be held, and not sold, in the account. The information used as the basis of the recommendations and instructions by Adviser will be derived from sources which are believed to be reliable, but whose accuracy is not guaranteed. Such information may or may not be independently verified by Adviser. As the results of market strategy cannot be guaranteed, Client acknowledges that the funds placed in the Account are beyond the normal and emergency needs of the Client. It is agreed that the sole standard of care imposed upon Adviser by this Agreement is to act with care, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like gain; provided, however, that nothing in this Agreement will be deemed to limit any responsibility or liability that Adviser may have to Client to the extent that such limitation would be inconsistent with applicable laws, including securities laws and ERISA fiduciary requirements. It is agreed that Adviser, in the maintenance of its records and reports, does not assume responsibility for the accuracy of information furnished by Client or any other party. The Adviser shall not be responsible or liable for any failure or delay in performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control including, without limitation, acts of civil or military authority, national emergencies, labor difficulties, fire, mechanical breakdowns, flood or catastrophe, acts of God, insurrection, war, riots or failure of the mails, transportation, communication or power supply.

## REPORTS TO CLIENTS

Adviser will provide Client with such periodic reports concerning the status of the assets under advisory authority as may reasonably be requested, and will furnish Client with quarterly appraisals of the assets and with such other reports concerning the investment status of the assets as may be reasonably requested.

## CONFIDENTIAL RELATIONSHIP

All information and advice furnished by either party to the other hereunder, including their respective agents and employees, shall be treated as confidential and shall not be disclosed to third parties except for to allow for the account management or as required by law.

## CUSTODY

Account assets will be held at TD Ameritrade Institutional, a division of TD Ameritrade, Inc. member FINRA/SIPC as our preferred custodian, or another custodian of your choosing if you so direct. Costs associated with and ability to service an account at another custodian may be more expensive and cumbersome or even unattainable.

## NON-ASSIGNMENT

Adviser is registered with the SEC as an investment adviser pursuant to the Investment Advisors Act of 1940 (the "Act"). In accordance with the Act, no assignment of this contract may be made without Client's express permission.

## WRITTEN DISCLOSURE STATEMENT

Client confirms that Adviser has delivered to Client a privacy disclosure and a document designated as "Form ADV, Part II." Adviser has advised Client that it has made such delivery pursuant to the requirements of the Act. If Form ADV, Part II was not delivered at least forty-eight (48) hours prior to entering into this Agreement, Client shall have the option to terminate this Agreement in its entirety, exercisable at the Client's sole option and without penalty, for five days from the date (shown below) of the signing of this Agreement; provided, however, that any investment action Adviser takes with regard to Client's account during such five-day period in reliance upon this Agreement and prior to Adviser's receipt of actual notice of Client's exercise of this right to termination, shall be at Client's sole risk.

## MANAGEMENT FEES

The annual fee for Adviser's services hereunder shall be a percentage of assets under management. *For the first quarter of this relationship, the fees shall be prorated over the number of days remaining in the quarter and billed at inception. Thereafter, Adviser will bill the client account directly on a quarterly basis, in advance, for management fees. The quarterly fee for accounts managed by Adviser ranges from 0.175% (0.70% annually), to a maximum of 0.50% (2.0% annually) if multiple strategies are used in the same account, of the beginning quarterly account value. See fee schedule for details.* As part of this agreement, Client authorizes the custodian for this account, to deduct the Adviser's fee directly from the account, or other account held by the client, upon presentation of an appropriate invoice showing the calculation of the fee. We may send a single invoice to one custodian even if fees reflected on that invoice relate to securities held by other custodians as well. Client, and not the custodian(s), will be responsible for verifying the accuracy of the fee calculation on Adviser's invoices and for reconciling payments by the custodian with the amounts of Adviser's invoices.

## BROKERAGE FEES AND BEST EXECUTION

Clients pay custodian / broker-dealer all commission costs associated with transactions. Although Adviser will use its best efforts to fulfill its best execution obligations with respect to the transactions made in this Account, Adviser may pay more than the lowest possible brokerage rate if Adviser determines, in good faith, that any additional amount of commission is reasonable in relation to the value of the brokerage and research services provided either with respect to any particular transaction in this Account, or Adviser's overall responsibilities with respect to the accounts over which it exercises investment discretion. The Account may participate in an aggregate order with those of other of Adviser's accounts, in which case the purchase or sale on behalf of the Account shall be at the average price of such an order. Client accounts are generally held at TD Ameritrade, Institutional, however if Client is referred from a B/D, and client wishes to retain the account relationship with the referring B/D, and that referring B/D may have trade execution rates higher than the lowest possible rate.

## CHANGES IN OBJECTIVE

It will be the responsibility of Client to promptly notify Adviser, in writing, of any changes in their personal situation which would alter their investment objectives, the additions to the account, as well as giving a minimum of three business day notice to Adviser prior to any significant withdrawals (requiring position liquidation) from the Account.

## ERISA MATTERS AND FIDUCIARY STANDARDS

In the event the Account is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (a) Client hereby appoints Adviser as an "investment manager," as that term is defined at Section 3(38) of ERISA; (b) Adviser accepts said appointment and, by its execution of this Agreement, represents and warrants that it is not disqualified from service as a fiduciary with respect to the assets in the Account by reason of the operation

of Section 411 of ERISA; (c) Adviser acknowledges that it is a fiduciary with respect to the assets in the accounts, and assumes the duties, responsibilities and obligations of a fiduciary under ERISA, including compliance with the prudent man, diversification and other standards of fiduciary responsibility required by ERISA and the documents and instruments governing the assets in the Account,

including the Plan's investment guidelines and policies, insofar as such documents and instruments are not inconsistent with ERISA; (d) Client acknowledges that Client is a "named fiduciary" with respect to the control and management of the assets in the account; (e) Client has delivered to Adviser copies of the governing plan documents, instruments and the plan's investment policies and guidelines; and (f) Adviser agrees to obtain and maintain a bond satisfying the requirement of Section 412 of ERISA, and to include Adviser and Adviser's principals, agents and employees among those insured under that bond.

## DURATION AND RENEWAL OF THIS AGREEMENT

This agreement shall remain in force until canceled by either party. If the Agreement is to be canceled prior to the end of a calendar quarter, the unearned portion of the fee, i.e., that portion of the fee relevant to the remainder of the quarter, will be returned to Client. It is specifically agreed that Client may terminate this Agreement within five days after the date of signing without payment of any fee, save any actual trading or administrative expenses.

## NOTICES

Unless otherwise specified herein, all notices, instructions and advice with respect to security transactions or any other matters contemplated by this Agreement shall be in writing and shall be deemed duly given when deposited by first-class mail addressed to (or delivered by hand to) Client at the address used by the custodian, to Adviser at the address appearing above, or at such other address or addresses as shall be specified, in each case, in a notice similarly given.

## SUB-ADVISOR INTEREST

Sheaff Brock Investment Advisors, LLC (SBIA) is a wholly owned subsidiary of Sheaff Brock Capital Management, LLC (SBCM). SBCM has an ownership interest in Salzinger Sheaff Brock, LLC and SBAuer Funds, LLC, the advisor to the Auer Growth Fund. SBCM has an affiliation through profits interest in Sellery Portfolio Management, LLC and Two Fish Management, LLC. Client accounts may have an allocation to products managed by these firms whereby sub-advisory revenues are shared with SBCM. For clients in the Auer Growth Fund, any mutual fund fees are separate and in addition to management fees charged by the Adviser.

## CLIENT CONTACT

Clients may receive periodic calls from adviser explaining account activity, inquiring about other financial needs, or accessing a client's general investment posture. Unless Adviser's financial planning services are used, the management of said account(s) should not be construed as financial planning services or other advisory services above and beyond the scope of our mutual agreement. We are available to discuss any account during regular business hours and will frequently communicate to you by newsletter or other electronic means. Clients will receive monthly statements, trading confirmations, quarterly performance reports and periodic written communication.

## TRADING AUTHORIZATION-LIMITED POWER ATTORNEY

In order to expedite the implementations of the objectives of the Adviser's investment strategy, the custodian(s) of the portfolio assets may be put on notice that Adviser has been retained as investment adviser, is appointed agent with full power and authority to act for and on behalf of Client with respect to the account(s) referred to below, and any other such accounts whether open at the present or opened hereafter, to buy, sell and trade in stocks, bonds, covered or cash secured option writing and any other securities, issued or un-issued, and to select the broker (s) to effect the same. The custodian(s) is (are) authorized to receive, deliver and hold each and every security or to accept or transmit the funds that may be required to complete the transactions contemplated herein, but custodian shall not deliver any assets of the Account to Adviser except as expressly provided above with respect to management fees. The broker(s) may be authorized and directed to follow the instructions of Adviser in every respect with regard to any purchases, sales, or trades for the aforesaid account(s) and the undersigned hereby ratifies and confirms any and all transactions, trades or dealings done in and for said account(s) by Adviser.

## PROXY VOTING

Generally, adviser does not vote proxies. If the Account is subject to ERISA, unless the voting of proxies with respect to the assets in the Account is designated to a named fiduciary with respect to the assets in the Account, and such designation is attached as an appendix to the Agreement, Adviser will exercise proxy voting rights with respect to the assets in the Account, in accordance with the investment guidelines and policies applicable to the assets in the Account, as provided to Adviser from time to time, in writing, by Client. In all other non-ERISA cases, Adviser shall have no rights or responsibilities for the voting of proxies with respect to the account.

## GOVERNING LAW

To the extent federal law does not apply, this Agreement shall be construed in accordance with and governed by the laws of the State of Indiana. Unless it is not in accordance with applicable law, all disputes will attempt to be settled by mediation first and by other means second. This Agreement constitutes the entire agreement of the parties with respect to the advisor relationship of the Account.

*By signing, I (we) acknowledge that we have read and agree to the terms of this agreement, and that I (we) have received a copy of the same. We also grant full investment discretion to advisor and grants use of TD Ameritrade as broker dealer and custodian.*

Account Title(s)

Sheldon S + Judith M Ferkey
Rev Trust UA Sep 05, 2013

## INVESTMENT POLICY AND ACCOUNT MANAGEMENT

My approximate net worth is: $ 5,000,000.—

These accounts represent about 15 % of my net worth.

My deposit into each style is approximately:

| Style | Fee | Investment |
|---|---|---|
| IntelliBuild | 1.25 | |
| Dividend Growth & Inc. | 1.25 | |
| Bulls of the Dow | 1.25 | |
| Mid-Cap 10 | 1.25 | |
| Tactical-Long/Cash Long/Short | 1.25 | |
| Dynamic Allocation | 1.25 | |
| Option / Covered Calls | 1.25 | |
| Option / Put Income | 1.25 | 780 K |
| Option / Iron Condor Income | 1.50 | |
| Option / Index Spread Income | 1.25 | |
| Preferred Income | 1.25 | |
| Core Plus Bonds | 0.70 | |
| High Yield Bonds | 0.90 | |
| Salzinger - Alternative | 0.96 | |
| Financial Planning Service | $1000/ module | |
| Managed account with Put Income or Index Spread overlay | Add'l 0.50 | |
| Managed account with Iron Condor overlay | Add'l 0.75 | |

Other:

920061199 LR (closed)

Account(s) will be managed in the manner you have instructed us until we are told otherwise. It is your or your appointed representative's responsibility to inform us of any major changes in your financial situation that would affect the investment goals of this account.

Signature of Account Holder                          Date

X  Sheldon S Ferkey                    14 Dec 2015

Signature of Additional Account Holder (if Applicable)    Date

X  Judith M. Ferkey                    12-14-15

# OPTION ACCOUNT DISCLOSURES

Portfolios offered by Sheaff Brock utilizing listed options have various investment objectives, goals, and risks. Please INITIAL in appropriate area and sign below.

## COVERED CALL ACCOUNTS
1. A covered call is a long position in a stock and a short position in a call option on that same stock, which gives someone else the right to "call" the stock away at a specific strike price.
2. A covered call position affords little downside protection to the underlying stock. Covered call accounts have similar downside risk as other accounts holding high quality equities.
3. A covered call limits upside participation of a stock's price gain to the strike price of the call option.
4. Capital gains generated are usually short-term gains.
5. There will be dividend income, but most positive return in an account will be short-term gain in nature.
6. As with any other long equity account, there will be periods when the stock market falls and a covered call account will fall in value.
7. Trading is reasonably active with several trades per month. The client pays all trading commissions.
8. Covered Call managed accounts generally should be considered a long-term commitment and entered into with a 3+ year market cycle time horizon.
   I (we) understand the above regarding covered calls _____

## OPTION OVERLAY ACCOUNTS
If Sheaff Brock (SB) is NOT managing your underlying account, you understand SB will not monitor your collateral positions 

## PUT INCOME ACCOUNTS
1. With short puts, no equities are owned, however a short position in a put option is written at a specific strike price, which gives someone else the right to "put" the stock to you, or force you to buy, at a specific strike price.
2. A short put on a stock, and a covered call on a stock, have identical risk characteristics.
3. A short put position affords little downside protection to the underlying stock. If the stock price falls below the put strike price, a short put has similar downside risk to holding high quality equities.
4. Upon occasion an option may get exercised before expiration forcing a purchase of shares. If that happens, generally the shares are immediately sold and a new option is written to replace the cash outlay difference.
5. Early exercise and sale of a stock may result in a wash sale for tax purposes.
6. Capital gains generated are nearly always short-term gains.
7. Trading is quite active, with more than a dozen trades per month. The client pays all trading commissions.
8. Put Income managed accounts generally should be considered a long-term commitment and entered into with a 3+ year market cycle time horizon.
   I (we) understand the above regarding selling puts _____

## IRON CONDOR INCOME ACCOUNTS
1. With iron condors, no equities are owned. An iron condor is the simultaneous sale of a put credit spread and a call credit spread on the same stock.
2. The risk of a credit spread is limited to the number of contracts multiplied by width of the spread. For example, 10 contracts of a put spread with a short position at $50 and a long position at $45 = risk of $5000. In the Iron Condor Income accounts the risk of each initial position is normally limited to 1% of the account value.
3. If a stock stays within the body of the short put and call strike prices, the position will expire with a profit.
4. If a stock moves through a condor "wing", the spread will be rolled out into future months. When this happens the position risk size will generally be increased slightly to roll with positive cash flow.
5. Upon occasion an option may get exercised before expiration forcing a purchase or sale of shares. If that happens, generally the shares are immediately bought or sold and a new spread is written to replace the cash outlay difference.
6. Early exercise and sale of a stock may result in a wash sale for tax purposes.
7. Capital gains generated are nearly always short-term gains.
8. Trading is very active, with more than a dozen trades per month. The client pays all trading commissions, which can be significant.
9. Iron Condor managed accounts generally should be considered a long-term commitment entered into with a 3+ year market cycle time horizon.
   I (we) understand the above regarding iron condor credit spreads _____

## INDEX SPREAD ACCOUNTS
1. With index spreads, no equities are owned. An index spread is the simultaneous sale of a put credit spread or a call credit spread on an index.
2. The risk of a credit spread is limited to the number of contracts multiplied by width of the spread. For example, a 20 contract put spread on the S&P 500 Index with a short position at $1950 and a long position at $1925 = risk of $50,000. In the Index Spread accounts the risk of each initial position is normally limited to 20% of the account value. For example, a $500,000 account would have $100,000 of capital at risk.
3. Positions have a "soft stop" position change at a loss of 1% of account value. However, in highly volatile periods with a "gap" opening, a trade loss could significantly exceed 1%, and could be as high as 20% of an account value.
4. If a position is stopped out, a new position may not immediately be rewritten, which may result in a temporary negative cash flow.
5. Index options are "European-style" and are cash settled, meaning there are no early exercises.
6. Capital gains are reported as 60% long-term and 40% short-term gain. Open positions are marked-to-market at year end.
7. Trading is not particularly active, normally less than five per month. The client pays all trading commissions.
8. Index Spread managed accounts generally should be considered a medium-term commitment entered into with a 1+ year time horizon.
   I (we) understand the above regarding index credit spreads _____

Signature of Account Holder                                                 Date

X _Shubh & Firkey_  14 Dec 2015

Signature of Additional Account Holder (if Applicable)                      Date

X _Judith M. Firkey_  12-14-15